# COKER *v.* GEORGIA

No. 75–5444.   Argued March 28, 1977—Decided June 29, 1977

WHITE, J., announced the Court's judgment and delivered an opinion, in which STEWART, BLACKMUN, and STEVENS, JJ., joined. BRENNAN, J., *post*, p. 600, and MARSHALL, J., *post*, p. 600, filed statements concurring in the judgment. POWELL, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 601. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 604.

*David E. Kendall* argued the cause for petitioner. With him on the briefs were *E. Kontz Bennett, Jr., Jack Greenberg, James M. Nabrit III, Peggy C. Davis,* and *Anthony G. Amsterdam.*

B. *Dean Grindle, Jr.,* Assistant Attorney General of Georgia, argued the cause for respondent. With him on the brief were *Arthur K. Bolton,* Attorney General, *Robert S. Stubbs II,* Executive Assistant Attorney General, *Richard L. Chambers,* First Assistant Attorney General, *John C. Walden,* Senior Assistant Attorney General, *Harrison Kohler,* Assistant Attorney General, and *Dewey Hayes.**

MR. JUSTICE WHITE announced the judgment of the Court and filed an opinion in which MR. JUSTICE STEWART, MR. JUSTICE BLACKMUN, and MR. JUSTICE STEVENS, joined.

Georgia Code Ann. § 26-2001 (1972) provides that "[a] person convicted of rape shall be punished by death or by imprisonment for life, or by imprisonment for not less than one nor more than 20 years."[1] Punishment is determined by a jury in a separate sentencing proceeding in which at least one of the statutory aggravating circumstances must be found before the death penalty may be imposed.[2] Petitioner Coker was convicted of rape and sentenced to death. Both the conviction and the sentence were affirmed by the Georgia Supreme Court. Coker was granted a writ of certiorari, 429 U. S. 815, limited to the single claim, rejected by the Georgia court, that the punishment of death for rape violates the Eighth Amendment, which proscribes "cruel and unusual punishments" and which must be observed by the States as well as the Federal Government. *Robinson* v. *California,* 370 U. S. 660 (1962).

---

*\*Ruth Bader Ginsburg, Melvin L. Wulf, Marjorie Mazen Smith,* and *Nancy Stearns* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

[1] The section defines rape as having "carnal knowledge of a female, forcibly and against her will. Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ."

[2] See n. 3, *infra.*

## I

While serving various sentences for murder, rape, kidnaping, and aggravated assault, petitioner escaped from the Ware Correctional Institution near Waycross, Ga., on September 2, 1974. At approximately 11 o'clock that night, petitioner entered the house of Allen and Elnita Carver through an unlocked kitchen door. Threatening the couple with a "board," he tied up Mr. Carver in the bathroom, obtained a knife from the kitchen, and took Mr. Carver's money and the keys to the family car. Brandishing the knife and saying "you know what's going to happen to you if you try anything, don't you," Coker then raped Mrs. Carver. Soon thereafter, petitioner drove away in the Carver car, taking Mrs. Carver with him. Mr. Carver, freeing himself, notified the police; and not long thereafter petitioner was apprehended. Mrs. Carver was unharmed.

Petitioner was charged with escape, armed robbery, motor vehicle theft, kidnaping, and rape. Counsel was appointed to represent him. Having been found competent to stand trial, he was tried. The jury returned a verdict of guilty, rejecting his general plea of insanity. A sentencing hearing was then conducted in accordance with the procedures dealt with at length in *Gregg* v. *Georgia,* 428 U. S. 153 (1976), where this Court sustained the death penalty for murder when imposed pursuant to the statutory procedures.[3] The jury was

---

[3] Ga. Code § 26–3102 (1977):

*"Capital offenses; jury verdict and sentence*

"Where, upon a trial by jury, a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the jury verdict includes a finding of at least one statutory aggravating circumstance and a recommendation that such sentence be imposed. Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the defendant to death. Where a sentence of death is not recommended by the jury, the court shall sentence the defendant to imprisonment as provided by law. Unless

instructed that it could consider as aggravating circumstances whether the rape had been committed by a person with a prior record of conviction for a capital felony and whether the rape

the jury trying the case makes a finding of at least one statutory aggravating circumstance and recommends the death sentence in its verdict, the court shall not sentence the defendant to death, provided that no such finding of statutory aggravating circumstance shall be necessary in offenses of treason or aircraft hijacking. The provisions of this section shall not affect a sentence when the case is tried without a jury or when the judge accepts a plea of guilty."

Ga. Code § 27-2302 (1977):

"*Recommendation to mercy*

"In all capital cases, other than those of homicide, when the verdict is guilty, with a recommendation to mercy, it shall be legal and shall be a recommendation to the judge of imprisonment for life. Such recommendation shall be binding upon the judge."

Ga. Code § 27-2534.1 (1977):

"*Mitigating and aggravating circumstances; death penalty*

"(a) The death penalty may be imposed for the offenses of aircraft hijacking or treason, in any case.

"(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

"(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

"(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

"(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

"(4) The offender committed the offense of murder for himself or

had been committed in the course of committing another capital felony, namely, the armed robbery of Allen Carver. The court also instructed, pursuant to statute, that even if

another, for the purpose of receiving money or any other thing of monetary value.

"(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

"(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

"(7) The offense of murder, rape, armed robbery or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

"(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

"(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

"(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another.

"(c) The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In non-jury cases the judge shall make such designation. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in section 27–2534.1 (b) is so found, the death penalty shall not be imposed."

Ga. Code § 27–2537 (1977):

*"Review of death sentences*

"(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Georgia. The clerk of the trial court, within ten days after receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of Georgia together with a

aggravating circumstances were present, the death penalty need not be imposed if the jury found they were outweighed by mitigating circumstances, that is, circumstances not constituting justification or excuse for the offense in question,

notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and the punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the Supreme Court of Georgia.

"(b) The Supreme Court of Georgia shall consider the punishment as well as any errors enumerated by way of appeal.

"(c) With regard to the sentence, the court shall determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

"(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27–2534.1 (b), and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"(d) Both the defendant and the State shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.

"(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

"(1) Affirm the sentence of death; or

"(2) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel. The records of those similar cases referred to by the Supreme Court of Georgia in its decision, and the extracts prepared as hereinafter provided for, shall be provided to the resentencing judge for his consideration.

"(f) There shall be an Assistant to the Supreme Court, who shall be an attorney appointed by the Chief Justice of Georgia and who shall serve at the pleasure of the court. The court shall accumulate the records of all capital felony cases in which sentence was imposed after January 1, 1970, or such earlier date as the court may deem appropriate. The Assistant shall provide the court with whatever extracted information it

"but which, in fairness and mercy, may be considered as extenuating or reducing the degree" of moral culpability or punishment. App. 300. The jury's verdict on the rape count was death by electrocution. Both aggravating circumstances on which the court instructed were found to be present by the jury.

## II

*Furman* v. *Georgia,* 408 U. S. 238 (1972), and the Court's decisions last Term in *Gregg* v. *Georgia,* 428 U. S. 153 (1976); *Proffitt* v. *Florida,* 428 U. S. 242 (1976); *Jurek* v. *Texas,* 428 U. S. 262 (1976); *Woodson* v. *North Carolina,* 428 U. S. 280 (1976); and *Roberts* v. *Louisiana,* 428 U. S. 325 (1976), make unnecessary the recanvassing of certain critical aspects of the controversy about the constitutionality of capital punishment. It is now settled that the death penalty is not invariably cruel and unusual punishment within the meaning of the Eighth Amendment; it is not inherently barbaric or an unacceptable mode of punishment for crime; neither is it always disproportionate to the crime for which it is imposed. It is also established that imposing capital punishment, at least for murder, in accordance with the procedures provided under the Georgia statutes saves the sentence from the infirmities which led the Court to invalidate the prior Georgia capital punishment statute in *Furman* v. *Georgia, supra.*

In sustaining the imposition of the death penalty in *Gregg,*

---

desires with respect thereto, including but not limited to a synopsis or brief of the facts in the record concerning the crime and the defendant.

"(g) The court shall be authorized to employ an appropriate staff and such methods to compile such data as are deemed by the Chief Justice to be appropriate and relevant to the statutory questions concerning the validity of the sentence.

"(h) The office of the Assistant shall be attached to the office of the Clerk of the Supreme Court of Georgia for administrative purposes.

"(i) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration. The court shall render its decision on legal errors enumerated, the factual substantiation of the verdict, and the validity of the sentence."

however, the Court firmly embraced the holdings and dicta from prior cases, *Furman* v. *Georgia, supra; Robinson* v. *California,* 370 U. S. 660 (1962); *Trop* v. *Dulles,* 356 U. S. 86 (1958); and *Weems* v. *United States,* 217 U. S. 349 (1910), to the effect that the Eighth Amendment bars not only those punishments that are "barbaric" but also those that are "excessive" in relation to the crime committed. Under *Gregg,* a punishment is "excessive" and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground. Furthermore, these Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent. To this end, attention must be given to the public attitudes concerning a particular sentence—history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions are to be consulted. In *Gregg,* after giving due regard to such sources, the Court's judgment was that the death penalty for deliberate murder was neither the purposeless imposition of severe punishment nor a punishment grossly disproportionate to the crime. But the Court reserved the question of the constitutionality of the death penalty when imposed for other crimes. 428 U. S., at 187 n. 35.

### III

That question, with respect to rape of an adult woman, is now before us. We have concluded that a sentence of death is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment.[4]

---

[4] Because the death sentence is a disproportionate punishment for rape, it is cruel and unusual punishment within the meaning of the Eighth

## A

As advised by recent cases, we seek guidance in history and from the objective evidence of the country's present judgment concerning the acceptability of death as a penalty for rape of an adult woman. At no time in the last 50 years have a majority of the States authorized death as a punishment for rape. In 1925, 18 States, the District of Columbia, and the Federal Government authorized capital punishment for the rape of an adult female.[5] By 1971 just prior to the decision in *Furman* v. *Georgia,* that number had declined, but not substantially, to 16 States plus the Federal Government.[6] *Furman* then invalidated most of the capital punishment statutes in this country, including the rape statutes, because, among other reasons, of the manner in which the death penalty was imposed and utilized under those laws.

With their death penalty statutes for the most part invalidated, the States were faced with the choice of enacting modified capital punishment laws in an attempt to satisfy the requirements of *Furman* or of being satisfied with life imprisonment as the ultimate punishment for *any* offense. Thirty-

Amendment even though it may measurably serve the legitimate ends of punishment and therefore is not invalid for its failure to do so. We observe that in the light of the legislative decisions in almost all of the States and in most of the countries around the world, it would be difficult to support a claim that the death penalty for rape is an indispensable part of the States' criminal justice system.

[5] See Bye, Recent History and Present Status of Capital Punishment in the United States, 17 J. Crim. L. & C. 234, 241–242 (1926).

[6] Ala. Code, Tit. 14, § 395 (1958); Ark. Stat. Ann. § 41–3403 (1964); Fla. Stat. Ann. § 794.01 (1965); Ga. Code § 26–2001 (1977); Ky. Rev. Stat. Ann. §§ 435.080–435.090 (1962); La. Rev. Stat. Ann. § 14:42 (1950); Md. Ann. Code, Art. 27, § 461 (1957); Miss. Code Ann. § 2358 (1957); Mo. Rev. Stat. § 559.260 (1969); Nev. Rev. Stat. § 200.360 (1963) (rape with substantial bodily harm); N. C. Gen. Stat. § 14–21 (1969); Okla. Stat. Ann., Tit. 21, § 1115 (1958); S. C. Code Ann. §§ 16–72, 16–80 (1962); Tenn. Code Ann. § 39–3702 (1955); Tex. Penal Code § 1189 (1961); Va. Code Ann. § 18.1–44 (1960); 18 U. S. C. § 2031.

594

five. States immediately reinstituted the death penalty for at least limited kinds of crime. *Gregg* v. *Georgia,* 428 U. S., at 179 n. 23. This public judgment as to the acceptability of capital punishment, evidenced by the immediate, post-*Furman* legislative reaction in a large majority of the States, heavily influenced the Court to sustain the death penalty for murder in *Gregg* v. *Georgia, supra,* at 179–182.

But if the "most marked indication of society's endorsement of the death penalty for murder is the legislative response to *Furman,*" *Gregg* v. *Georgia, supra,* at 179–180, it should also be a telling datum that the public judgment with respect to rape, as reflected in the statutes providing the punishment for that crime, has been dramatically different. In reviving death penalty laws to satisfy *Furman*'s mandate, none of the States that had not previously authorized death for rape chose to include rape among capital felonies. Of the 16 States in which rape had been a capital offense, only three provided the death penalty for rape of an adult woman in their revised statutes—Georgia, North Carolina, and Louisiana. In the latter two States, the death penalty was mandatory for those found guilty, and those laws were invalidated by *Woodson* and *Roberts.* When Louisiana and North Carolina, responding to those decisions, again revised their capital punishment laws, they re-enacted the death penalty for murder but not for rape; none of the seven other legislatures that to our knowledge have amended or replaced their death penalty statutes since July 2, 1976, including four States (in addition to Louisiana and North Carolina) that had authorized the death sentence for rape prior to 1972 and had reacted to *Furman* with mandatory statutes, included rape among the crimes for which death was an authorized punishment.[7]

[7] 1976 Okla. Sess. Laws, c. 1, p. 627; 1976 La. Acts, Nos. 657, 694; 1976 Ky. Acts, c. 15 (Ex. Sess.); 1977 Wyo. Sess. Laws, c. 122. Recent legislative action has taken place in North Carolina, Virginia, Maryland, California, and New Jersey. The legislation has been signed into law in

Georgia argues that 11 of the 16 States that authorized death for rape in 1972 attempted to comply with *Furman* by enacting arguably mandatory death penalty legislation and that it is very likely that, aside from Louisiana and North Carolina, these States simply chose to eliminate rape as a capital offense rather than to *require* death for *each* and *every* instance of rape.[8] The argument is not without force; but 4 of the 16 States did not take the mandatory course and also did *not* continue rape of an adult woman as a capital offense. Further, as we have indicated, the legislatures of 6 of the 11 arguably mandatory States have revised their death penalty laws since *Woodson* and *Roberts* without enacting a new death penalty for rape. And this is to say nothing of 19 other States that enacted nonmandatory, post-*Furman* statutes and chose not to sentence rapists to death.

It should be noted that Florida, Mississippi, and Tennessee also authorized the death penalty in some rape cases, but only where the victim was a child and the rapist an adult.[9] The Tennessee statute has since been invalidated because the death sentence was mandatory. *Collins* v. *State*, 550 S. W. 2d 643 (Tenn. 1977). The upshot is that Georgia is the sole jurisdic-

North Carolina and Virginia, N. C. Sess. Laws (May 19, 1977); 1977 Va. Acts, c. 492 (Mar. 29, 1977), and has been vetoed in Maryland and California, Washington Post, May 27, 1977, p. A1, col. 1; N. Y. Times, May 28, 1977, p. 8, col. 6. The Governor of New Jersey apparently has not yet acted on the legislation in that State.

[8] The legislation that respondent places in this category is as follows:

Ky. Rev. Stat. § 507.020 (1975); La. Rev. Stat. Ann. § 14:30 (1974); Md. Code Ann., Art. 27, § 413 (b) (Supp. 1976); Miss. Code Ann. §§ 97-3-19, 97-3-21, 97-25-55, 99-17-20 (Supp. 1975); Mo. Rev. Stat. §§ 559.005, 559.009 (Supp. 1975); Nev. Rev. Stat. § 200.030 (1975); N. C. Gen. Stat. §§ 14-17, 14-21 (Supp. 1975); Okla. Stat. Ann., Tit. 21, §§ 701.1-701.3 (Supp. 1975); S. C. Code Ann. § 16-52 (Supp. 1975); Tenn. Code Ann. §§ 39-2402, 39-2406, 39-3702 (1975); Va. Code Ann. §§ 18.2-10, 18.2-31 (1975). Brief for Respondent 19 n. 38.

[9] Fla. Stat. Ann. § 794.011 (2) (1976); Miss. Code Ann. § 97-3-65 (Supp. 1976); Tenn. Code Ann. § 39-3702 (1974).

tion in the United States at the present time that authorizes a sentence of death when the rape victim is an adult woman, and only two other jurisdictions provide capital punishment when the victim is a child.

The current judgment with respect to the death penalty for rape is not wholly unanimous among state legislatures, but it obviously weighs very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman.[10]

### B

It was also observed in *Gregg* that "[t]he jury . . . is a significant and reliable objective index of contemporary values because it is so directly involved," 428 U. S., at 181, and that it is thus important to look to the sentencing decisions that juries have made in the course of assessing whether capital punishment is an appropriate penalty for the crime being tried. Of course, the jury's judgment is meaningful only where the jury has an appropriate measure of choice as to whether the death penalty is to be imposed. As far as execution for rape is concerned, this is now true only in Georgia and in Florida; and in the latter State, capital punishment is authorized only for the rape of children.

According to the factual submissions in this Court, out of all rape convictions in Georgia since 1973—and that total number has not been tendered—63 cases had been reviewed by the Georgia Supreme Court as of the time of oral argument; and of these, 6 involved a death sentence, 1 of which was set aside, leaving 5 convicted rapists now under sentence

---

[10] In *Trop* v. *Dulles*, 356 U. S. 86, 102 (1958), the plurality took pains to note the climate of international opinion concerning the acceptability of a particular punishment. It is thus not irrelevant here that out of 60 major nations in the world surveyed in 1965, only 3 retained the death penalty for rape where death did not ensue. United Nations, Department of Economic and Social Affairs, Capital Punishment 40, 86 (1968).

of death in the State of Georgia. Georgia juries have thus sentenced rapists to death six times since 1973. This obviously is not a negligible number; and the State argues that as a practical matter juries simply reserve the extreme sanction for extreme. cases of rape and that recent experience surely does not prove that jurors consider the death penalty to be a disproportionate punishment for every conceivable instance of rape, no matter how aggravated. Nevertheless, it is true that in the vast majority of cases, at least 9 out of 10, juries have not imposed the death sentence.

## IV

These recent events evidencing the attitude of state legislatures and sentencing juries do not wholly determine this controversy, for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment. Nevertheless, the legislative rejection of capital punishment for rape strongly confirms our own judgment, which is that death is indeed a disproportionate penalty for the crime of raping an adult woman.

We do not discount the seriousness of rape as a crime. .It is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the latter's privilege of choosing those with whom intimate relationships are to be established. Short of homicide, it is the "ultimate violation of self." [11] It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. Rape is very often accom-

---

[11] U. S. Dept. of Justice, Law Enforcement Assistance Administration Report, Rape and Its Victims: A Report for Citizens, Health Facilities, and Criminal Justice Agencies 1 (1975), quoting Bard & Ellison, Crisis Intervention and Investigation of Forcible Rape, The Police Chief (May 1974), reproduced as Appendix I–B to the Report.

panied by physical injury to the female and can also inflict mental and psychological damage.[12] Because it undermines the community's sense of security, there is public injury as well.

Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of the injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, rape by definition does not include the death of or even the serious injury to another person.[13] The murderer kills; the rapist, if no more than that, does not. Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair. We have the abiding conviction that the death penalty, which "is unique in its severity and irrevocability," *Gregg* v. *Georgia*, 428 U. S., at 187, is an excessive penalty for the rapist who, as such, does not take human life.

This does not end the matter; for under Georgia law, death may not be imposed for any capital offense, including rape, unless the jury or judge finds one of the statutory aggravating circumstances and then elects to impose that sentence. Ga. Code § 26–3102 (1977); *Gregg* v. *Georgia, supra,* at 165–166. For the rapist to be executed in Georgia, it must therefore be found not only that he committed rape but also that one or more of the following aggravating circumstances were present: (1) that the rape was committed by a person with a prior record of conviction for a capital felony; (2) that the rape was committed while the offender was engaged in the commission of another capital felony, or aggravated battery; or (3) the rape "was outrageously or wantonly vile, horrible or

---

[12] See Note, The Victim In a Forcible Rape Case; A Feminist View , 11 Am. Crim. L. Rev. 335, 338 (1973); Comment, Rape and Rape Laws: Sexism in Society and Law, 61 Calif. L. Rev. 919, 922–923 (1973).

[13] See n. 1, *supra,* for the Georgia definition of rape.

inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim." [14] Here, the first two of these aggravating circumstances were alleged and found by the jury.

Neither of these circumstances, nor both of them together, change our conclusion that the death sentence imposed on Coker is a disproportionate punishment for rape. Coker had prior convictions for capital felonies—rape, murder, and kidnaping—but these prior convictions do not change the fact that the instant crime being punished is a rape not involving the taking of life.

It is also true that the present rape occurred while Coker was committing armed robbery, a felony for which the Georgia statutes authorize the death penalty. [15] But Coker was tried for the robbery offense as well as for rape and received a separate life sentence for this crime; the jury did not deem the robbery itself deserving of the death penalty, even though accompanied by the aggravating circumstance, which was stipulated, that Coker had been convicted of a prior capital crime. [16]

---

[14] There are other aggravating circumstances provided in the statute, see n. 3, *supra,* but they are not applicable to rape.

[15] In *Gregg* v. *Georgia,* the Georgia Supreme Court refused to sustain a death sentence for armed robbery because, for one reason, death had been so seldom imposed for this crime in other cases that such a sentence was excessive and could not be sustained under the statute. As it did in this case, however, the Georgia Supreme Court apparently continues to recognize armed robbery as a capital offense for the purpose of applying the aggravating-circumstances provisions of the Georgia Code.

[16] Where the accompanying capital crime is murder, it is most likely that the defendant would be tried for murder, rather than rape; and it is perhaps academic to deal with the death sentence for rape in such a circumstance. It is likewise unnecessary to consider the rape-felony murder—a rape accompanied by the death of the victim which was unlawfully but nonmaliciously caused by the defendant.

Where the third aggravating circumstance mentioned in the text is

We note finally that in Georgia a person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. He also commits that crime when in the commission of a felony he causes the death of another human being, irrespective of malice. But even where the killing is deliberate, it is not punishable by death absent proof of aggravating circumstances. It is difficult to accept the notion, and we do not, that the rapist, with or without aggravating circumstances, should be punished more heavily than the deliberate killer as long as the rapist does not himself take the life of his victim. The judgment of the Georgia Supreme Court upholding the death sentence is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE BRENNAN, concurring in the judgment.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (dissenting opinion), I concur in the judgment of the Court setting aside the death sentence imposed under the Georgia rape statute.

MR. JUSTICE MARSHALL, concurring in the judgment.

In *Gregg* v. *Georgia,* 428 U. S. 153, 231 (1976) (dissenting opinion), I stated: "In *Furman* v. *Georgia,* 408 U. S. 238, 314 (1972) (concurring opinion), I set forth at some length my views on the basic issue presented to the Court in these cases. The death penalty, I concluded, is a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. That continues to be my view."

---

present—that the rape is particularly vile or involves torture or aggravated battery—it would seem that the defendant could very likely be convicted, tried, and appropriately punished for this additional conduct.

I then explained in some detail my reasons for reaffirming my position. I continue to adhere to those views in concurring in the judgment of the Court in this case.

MR. JUSTICE POWELL, concurring in the judgment in part and dissenting in part.

I concur in the judgment of the Court on the facts of this case, and also in the plurality's reasoning supporting the view that ordinarily death is disproportionate punishment for the crime of raping an adult woman. Although rape invariably is a reprehensible crime, there is no indication that petitioner's offense was committed with excessive brutality or that the victim sustained serious or lasting injury. The plurality, however, does not limit its holding to the case before us or to similar cases. Rather, in an opinion that ranges well beyond what is necessary, it holds that capital punishment *always*—regardless of the circumstances—is a disproportionate penalty for the crime of rape.

The Georgia statute, sustained in *Gregg* v. *Georgia*, 428 U. S. 153 (1976), specifies aggravating circumstances that may be considered by the jury when appropriate. With respect to the crime of rape, only three such circumstances are specified: (i) the offense was committed by a person with a prior record of conviction for a capital felony; (ii) the offense was committed while the offender was engaged in another capital felony or in aggravated battery; and (iii) the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Ante*, at 588–589, n. 3. Only the third circumstance describes in general the offense of aggravated rape, often identified as a separate and more heinous offense than rape. See, *e. g.*, ALI, Model Penal Code § 207.4, Comment, p. 246 (Tent. Draft No. 4, 1955); ALI, Model Penal Code § 213.1 (Prop. Off. Draft, 1962); Nev. Rev. Stat. § 200.363 (1975). That third circumstance was not sub-

mitted to the jury in this case, as the evidence would not have supported such a finding. It is therefore quite unnecessary for the plurality to write in terms so sweeping as to foreclose each of the 50 state legislatures from creating a narrowly defined substantive crime of aggravated rape punishable by death.[1]

In accord with our decisions last Term, the plurality opinion states:

> "[T]he death penalty is not invariably cruel and unusual punishment within the meaning of the Eighth Amend-

---

[1] It is not this Court's function to formulate the relevant criteria that might distinguish aggravated rape from the more usual case, but perhaps a workable test would embrace the factors identified by Georgia: the cruelty or viciousness of the offender, the circumstances and manner in which the offense was committed, and the consequences suffered by the victim. See also *Ralph* v. *Warden*, 438 F. 2d 786 (CA4 1970), cert. denied, 408 U. S. 942 (1972); 438 F. 2d, at 794 (opinion of Haynsworth, C. J.). The legislative task of defining, with appropriate specificity, the elements of the offense of aggravated rape would not be easy, see *Furman* v. *Georgia*, 408 U. S. 238, 460 (1972) (POWELL, J., dissenting), but certainly this Court should not assume that the task is impossible.

The dissent of THE CHIEF JUSTICE, relying on selected excerpts from my opinion in *Furman*, seeks to buttress the view that for sentencing purposes meaningful distinctions cannot be drawn between rapes regardless of the circumstances and effect upon the victim. *Post*, at 607–608, n. 2. The dissent emphasizes the difficulties of proof. But the jury system is designed and operates successfully to resolve precisely this type of factual issue. The law of negligence, for example, is replete with issues requiring the jury to determine degrees of culpability and the extent or permanency of physical and psychological injury.

I am complimented by the frequency with which THE CHIEF JUSTICE, in his dissent, cites and quotes from my opinion in *Furman*. That opinion, however, did not prevail, and—as with most of the writing in *Furman*—it now must be read in light of *Gregg* and *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), which have established the controlling general principles. But contrary to implications in THE CHIEF JUSTICE's dissent, my opinion in *Furman* did emphasize that the proportionality test as to rape should be applied on a case-by-case basis, noting that in some cases the death sentence would be "grossly excessive." 408 U. S., at 461. I remain

ment; it is not inherently barbaric or an unacceptable mode of punishment for crime; neither is it always disproportionate to the crime for which it is imposed." *Ante,* at 591.

Thus, capital punishment may be imposed on those sentenced in accordance with the procedures identified in *Gregg* and *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), at least when the offender is convicted of murder, the crime involved in all five of last Term's capital cases.

Today, in a case that does not require such an expansive pronouncement, the plurality draws a bright line between murder and all rapes—regardless of the degree of brutality of the rape or the effect upon the victim. I dissent because I am not persuaded that such a bright line is appropriate. As noted in *Snider* v. *Peyton,* 356 F. 2d 626, 627 (CA4 1966), "[t]here is extreme variation in the degree of culpability of rapists." The deliberate viciousness of the rapist may be greater than that of the murderer. Rape is never an act committed accidentally. Rarely can it be said to be unpremeditated. There also is wide variation in the effect on the victim. The plurality opinion says that "[l]ife is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair." *Ante,* at 598. But there is indeed "extreme variation" in the crime of rape. Some victims are so grievously injured physically or psychologically that life *is* beyond repair.

Thus, it may be that the death penalty is not disproportionate punishment for the crime of aggravated rape. Final resolution of the question must await careful inquiry into objective indicators of society's "evolving standards of decency," particularly legislative enactments and the responses of juries in capital cases.[2] See *Gregg* v. *Georgia, supra,* at 173–182

in disagreement with the simplistic all-or-nothing views of the plurality opinion and the dissenting opinion of THE CHIEF JUSTICE.

[2] These objective indicators are highly relevant, but the ultimate deci-

(joint opinion of STEWART, POWELL, and STEVENS, JJ.) ; *Woodson* v. *North Carolina, supra,* at 294–295 (plurality opinion) ; *Furman* v. *Georgia,* 408 U. S. 238, 436–443 (1972) (POWELL, J., dissenting). The plurality properly examines these indicia, which do support the conclusion that society finds the death penalty unacceptable for the crime of rape in the absence of excessive brutality or severe injury. But it has not been shown that society finds the penalty disproportionate for all rapes. In a proper case a more discriminating inquiry than the plurality undertakes well might discover that both juries and legislatures have reserved the ultimate penalty for the case of an outrageous rape resulting in serious, lasting harm to the victim. I would not prejudge the issue. To this extent, I respectfully dissent.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE REHNQUIST joins, dissenting.

In a case such as this, confusion often arises as to the Court's proper role in reaching a decision. Our task is not to give effect to our individual views on capital punishment; rather, we must determine what the Constitution permits a State to do under its reserved powers. In striking down the death penalty imposed upon the petitioner in this case, the Court has overstepped the bounds of proper constitutional adjudication by substituting its policy judgment for that of the state legislature. I accept that the Eighth Amendment's concept of disproportionality bars the death penalty for minor crimes. But rape is not a minor crime; hence the Cruel and Unusual Punishments Clause does not give the Members of this Court license to engraft their conceptions of proper public policy onto the considered legislative judgments of the States. Since I cannot agree that Georgia lacked the consti-

sion as to the appropriateness of the death penalty under the Eighth Amendment—as the plurality notes, *ante,* at 597—must be decided on the basis of our own judgment in light of the precedents of this Court.

tutional power to impose the penalty of death for rape, I dissent from the Court's judgment.

## (1)

On December 5, 1971, the petitioner, Ehrlich Anthony Coker, raped and then stabbed to death a young woman. Less than eight months later Coker kidnaped and raped a second young woman. After twice raping this 16-year-old victim, he stripped her, severely beat her with a club, and dragged her into a wooded area where he left her for dead. He was apprehended and pleaded guilty to offenses stemming from these incidents. He was sentenced by three separate courts to three life terms, two 20-year terms, and one 8-year term of imprisonment.[1] Each judgment specified that the sentences it imposed were to run consecutively rather than concurrently. Approximately 1½ years later, on September 2, 1974, petitioner escaped from the state prison where he was serving these sentences. He promptly raped another 16-year-old woman in the presence of her husband, abducted her from her home, and threatened her with death and serious bodily harm. It is this crime for which the sentence now under review was imposed.

The Court today holds that the State of Georgia may not impose the death penalty on Coker. In so doing, it prevents the State from imposing any effective punishment upon Coker for his latest rape. The Court's holding, moreover, bars Georgia from guaranteeing its citizens that they

---

[1] On March 12, 1973, the Superior Court of Richmond County, Ga., sentenced Coker to 20 years' imprisonment for the kidnaping of petitioner's second victim, and to life imprisonment for one act of rape upon her. On May 28, 1973, the Superior Court of Taliaferro County, Ga., sentenced Coker to eight years' imprisonment for aggravated assault upon the same victim, and to life imprisonment for the second rape upon her. On April 6, 1973, the Superior Court of Clayton County, Ga., sentenced Coker to 20 years' imprisonment for the rape of petitioner's first victim, and to life imprisonment for her murder. App. 307–312.

will suffer no further attacks by this habitual rapist. In fact, given the lengthy sentences Coker must serve for the crimes he has already committed, the Court's holding assures that petitioner—as well as others in his position—will henceforth feel no compunction whatsoever about committing further rapes as frequently as he may be able to escape from confinement and indeed even within the walls of the prison itself. To what extent we have left States "elbow-room" to protect innocent persons from depraved human beings like Coker remains in doubt.

### (2)

My first disagreement with the Court's holding is its unnecessary breadth. The narrow issue here presented is whether the State of Georgia may constitutionally execute this petitioner for the particular rape which he has committed, in light of all the facts and circumstances shown by this record. The plurality opinion goes to great lengths to consider societal mores and attitudes toward the generic crime of rape and the punishment for it; however, the opinion gives little attention to the special circumstances which bear directly on whether imposition of the death penalty is an appropriate societal response to Coker's criminal acts: (a) On account of his prior offenses, Coker is already serving such lengthy prison sentences that imposition of additional periods of imprisonment would have no incremental punitive effect; (b) by his life pattern Coker has shown that he presents a particular danger to the safety, welfare, and chastity of women, and on his record the likelihood is therefore great that he will repeat his crime at the first opportunity; (c) petitioner escaped from prison, only a year and a half after he commenced serving his latest sentences; he has nothing to lose by further escape attempts; and (d) should he again succeed in escaping from prison, it is reasonably predictable that he will repeat his pattern of attacks on

women—and with impunity since the threat of added prison sentences will be no deterrent.

Unlike the plurality, I would narrow the inquiry in this case to the question actually presented: Does the Eighth Amendment's ban against cruel and unusual punishment prohibit the State of Georgia from executing a person who has, within the space of three years, raped three separate women, killing one and attempting to kill another, who is serving prison terms exceeding his probable lifetime and who has not hesitated to escape confinement at the first available opportunity? Whatever one's view may be as to the State's constitutional power to impose the death penalty upon a rapist who stands before a court convicted for the first time, this case reveals a chronic rapist whose continuing danger to the community is abundantly clear.

MR. JUSTICE POWELL would hold the death sentence inappropriate in *this* case because "there is no indication that petitioner's offense was committed with excessive brutality or that the victim sustained serious or lasting injury." *Ante, at* 601.[2] Apart from the reality that rape is inherently one

___

[2] The position today adopted by Mr. JUSTICE POWELL constitutes a disquieting shift from the view he embraced several Terms ago in *Furman* v. *Georgia,* 408 U. S. 238, 460–461 (1972) (dissenting opinion), where he stated:

"While I reject each of [petitioners'] attempts to establish specific categories of cases in which the death penalty may be deemed excessive, I view them as groping toward what is for me the appropriate application of the Eighth Amendment. While in my view *the disproportionality test may not be used either to strike down the death penalty for rape altogether or to install the Court as a tribunal for sentencing review, that test may find its application in the peculiar circumstances of specific cases. Its utilization should be limited to the rare case in which the death penalty is rendered for a crime technically falling within the legislatively defined class but factually falling outside the likely legislative intent in creating the category."* (Emphasis added.)

While MR. JUSTICE POWELL purports to dissent from the broadest sweep of the Court's holding, I cannot see that his view differs materially from that of the plurality. He suggests two situations where it might be proper to execute rapists: (1) where the "offense [is] committed

of the most egregiously brutal acts one human being can inflict upon another, there is nothing in the Eighth Amendment that so narrowly limits the factors which may be considered by a state legislature in determining whether a particular punishment is grossly excessive. Surely recidivism, especially the repeated commission of heinous crimes, is a factor which may properly be weighed as an aggravating circumstance, permitting the imposition of a punishment more severe than for one isolated offense. For example, as a matter of national policy, Congress has expressed its will that a person who has committed two felonies will suffer enhanced punishment for a third one, 18 U. S. C. § 3575 (e)(1); Congress has also declared that a second conviction for assault on a mail carrier may be punished more seriously than a first such conviction, 18 U. S. C. § 2114. Many States

with excessive brutality"; and (2) where "the victim sustained serious or lasting injury." The second part of this test was rejected by MR. JUSTICE POWELL himself in *Furman,* and with good reason: "[T]he emotional impact [upon the rape victim] may be impossible to gauge at any particular point in time. The extent and duration of psychological trauma may not be known or ascertainable prior to the date of trial." *Id.,* at 460. Can any Member of the Court state with confidence that a 16-year-old woman who is raped in the presence of her husband three weeks after giving birth to a baby "sustained [no] serious or lasting injury"? This bifurcation of rape into categories of harmful and nonharmful eludes my comprehension.

The difficulty with the first part of MR. JUSTICE POWELL's test is that rape is inherently an aggravated offense; in MR. JUSTICE POWELL's own words, "the threat of both [physical and psychological] injury is always present." *Id.,* at 459. Therefore the "excessive brutality" requirement must refer to something more, I assume, than the force normally associated with physically coercing or overpowering the will of another. Rather, what must be meant is that the rapist has engaged in torture or has committeed an aggravated battery upon the victim. See *ante,* at 601–602, and n. 1. However, torture and aggravated battery are offenses separate from rape, and ordinarily are punished separately. The clear negative inference of MR. JUSTICE POWELL's analysis therefore appears to be that where rape alone is committed, *i. e.,* rape unaccompanied by any other criminal conduct, the death penalty may never be imposed.

provide an increased penalty for habitual criminality. See, *e. g.,* Wis. Stat. Ann. § 939.62 (1958); see also Annot., 58 A. L. R. 20 (1929); 82 A. L. R. 345 (1933); 79 A. L. R. 2d 826 (1961).[3] As a factual matter, the plurality opinion is correct in stating that Coker's "prior convictions do not change the fact that the instant crime being punished is a rape not involving the taking of life," *ante,* at 599; however, it cannot be disputed that the existence of these prior convictions makes Coker a substantially more serious menace to society than a first-time offender:[4]

> "There is a widely held view that those who present the strongest case for severe measures of incapacitation are not murderers as a group (their offenses often are situational) *but rather those who have repeatedly engaged in violent, combative behavior.* A well-demonstrated

---

[3] This Court has consistently upheld the constitutional validity of such punishment-enhancing statutes. See, *e. g., Spencer* v. *Texas,* 385 U. S. 554, 559–560 (1967):

"No claim is made here that recidivist statutes are . . . unconstitutional, nor could there be under our cases. Such statutes and other enhanced-sentence laws, and procedures designed to implement their underlying policies, have been enacted in all the States, and by the Federal Government as well. . . . Such statutes . . . have been sustained in this Court on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy, *ex post facto* laws, *cruel and unusual punishment,* due process, equal protection, and privileges and immunities." (Footnote and citations omitted; emphasis added.)

Accord, *Oyler* v. *Boles,* 368 U. S. 448, 451 (1962).

[4] This special danger is demonstrated by the very record in this case. After tying and gagging the victim's husband, and raping the victim, petitioner sought to make his getaway in their automobile. Leaving the victim's husband tied and gagged in his bathroom, Coker took the victim with him. As he started to leave, he brandished the kitchen knife he was carrying and warned the husband that "if he would get pulled over or the police was following him in any way that he would kill—he would kill my wife. *He said he didn't have nothing to lose—that he was in prison for the rest of his life, anyway* . . . ." Testimony of the victim's husband, App. 121 (emphasis added).

propensity for life-endangering behavior is thought to provide a more solid basis for infliction of the most severe measures of incapacitation than does the fortuity of a single homicidal incident." Packer, Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1080 (1964). (Emphasis added.)

In my view, the Eighth Amendment does not prevent the State from taking an individual's "well-demonstrated propensity for life-endangering behavior" into account in devising punitive measures which will prevent inflicting further harm upon innocent victims. See *Gregg* v. *Georgia,* 428 U. S. 153, 183 n. 28 (1976). Only one year ago MR. JUSTICE WHITE succinctly noted: "[D]eath finally forecloses the possibility that a prisoner will commit further crimes, whereas life imprisonment does not." *Roberts* v. *Louisiana,* 428 U. S. 325, 354 (1976) (dissenting opinion); see also *Furman* v. *Georgia,* 408 U. S., at 311 (WHITE, J., concurring).

In sum, once the Court has held that "the punishment of death does not invariably violate the Constitution," *Gregg* v. *Georgia, supra,* at 169, it seriously impinges upon the State's legislative judgment to hold that it may not impose such sentence upon an individual who has shown total and repeated disregard for the welfare, safety, personal integrity, and human worth of others, and who seemingly cannot be deterred from continuing such conduct.[5] I therefore would

---

[5] Professor Packer addressed this:

"What are we to do with those whom we cannot reform, and, in particular, those who by our failure are thought to remain menaces to life? Current penal theories admit, indeed insist upon, the need for permanent incapacitation in such cases. Once this need is recognized, the death penalty as a means of incapacitation for the violent psychopath can hardly be objected to on grounds that will survive rational scrutiny, *if the use of the death penalty in any situation is to be permitted.* And its use in rape cases as a class, while inept, is no more so than its use for any other specific offense involving danger to life and limb." Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1081 (1964). (Emphasis added.)

hold that the death sentence here imposed is within the power reserved to the State and leave for another day the question of whether such sanction would be proper under other circumstances. The dangers which inhere whenever the Court casts its constitutional decisons in terms sweeping beyond the facts of the case presented, are magnified in the context of the Eighth Amendment. In *Furman* v. *Georgia, supra,* at 431, MR. JUSTICE POWELL, in dissent, stated:

> "[W]here, as here, the language of the applicable [constitutional] provision provides great leeway and where the underlying social policies are felt to be of vital importance, the temptation to read personal preference into the Constitution is understandably great. *It is too easy to propound our subjective standards of wise policy under the rubric of more or less universally held standards of decency.*" (Emphasis added.)

Since the Court now invalidates the death penalty as a sanction for all rapes of adults at all times under all circumstances,[6] I reluctantly turn to what I see as the broader issues raised by this holding.

## (3)

The plurality, *ante,* at 597–598, acknowledges the gross nature of the crime of rape. A rapist not only violates a victim's privacy and personal integrity, but inevitably causes serious psychological as well as physical harm in the process. The long-range effect upon the victim's life and health is likely

---

[6] I find a disturbing confusion as to this issue in the plurality opinion. The issue is whether Georgia can, under any circumstances and for any kind of rape—"mild" or "gross"—impose the death penalty. Yet the plurality opinion opens its discussion, apparently directed at demonstrating that this was not an "aggravated" rape, saying that following the rape and kidnaping, "Mrs. Carver was unharmed." *Ante,* at 587. If the Court is holding that no rape can ever be punished by death, why is it relevant whether Mrs. Carver was "unharmed"?

to be irreparable; it is impossible to measure the harm which results. Volumes have been written by victims, physicians, and psychiatric specialists on the lasting injury suffered by rape victims. Rape is not a mere physical attack—it is destructive of the human personality. The remainder of the victim's life may be gravely affected, and this in turn may have a serious detrimental effect upon her husband and any children she may have. I therefore wholly agree with MR. JUSTICE WHITE's conclusion as far as it goes—that "[s]hort of homicide, [rape] is the 'ultimate violation of self.'" *Ante,* at 597. Victims may recover from the physical damage of knife or bullet wounds, or a beating with fists or a club, but recovery from such a gross assault on the human personality is not healed by medicine or surgery. To speak blandly, as the plurality does, of rape victims who are "unharmed," or to classify the human outrage of rape, as does MR. JUSTICE POWELL, in terms of "excessively brutal," *ante,* at 601, versus "moderately brutal," takes too little account of the profound suffering the crime imposes upon the victims and their loved ones.

Despite its strong condemnation of rape, the Court reaches the inexplicable conclusion that "the death penalty . . . is an excessive penalty" for the perpetrator of this heinous offense.[7] This, the Court holds, is true even though in Georgia the death penalty may be imposed only where the rape is coupled with one or more aggravating circumstances. The process by which this conclusion is reached is as startling as it is disquieting. It represents a clear departure from precedent by making this Court "under the aegis of the Cruel and Unusual Punishments Clause, the ultimate arbiter of the standards of criminal responsibility in diverse areas of the

---

[7] While only three Justices have joined MR. JUSTICE WHITE in this portion of his opinion, see separate opinion of MR. JUSTICE POWELL, *ante,* p. 601, I take this to be the view of the Court in light of MR. JUSTICE BRENNAN's and MR. JUSTICE MARSHALL's statements joining the judgment.

criminal law, throughout the country." *Powell* v. *Texas,* 392 U. S. 514, 533 (1968) (opinion of MARSHALL, J.).[8] This seriously strains and distorts our federal system, removing much of the flexibility from which it has drawn strength for two centuries.

The analysis of the plurality opinion is divided into two parts: (a) an "objective" determination that most American jurisdictions do not presently make rape a capital offense, and (b) a subjective judgment that death is an excessive punishment for rape because the crime does not, in and of itself, cause the death of the victim. I take issue with each of these points.

(a)

The plurality opinion bases its analysis, in part, on the fact that "Georgia is the sole jurisdiction in the United States at the present time that authorizes a sentence of death when the rape victim is an adult woman." *Ante,* at 595–596. Surely, however, this statistic cannot be deemed determinative, or even particularly relevant. As the opinion concedes, *ante,* at 594, two other States—Louisiana and North Carolina—have enacted death penalty statutes for adult rape since this Court's 1972 decision in *Furman* v. *Georgia,* 408 U. S. 238. If the Court is to rely on some "public opinion" process, does this not suggest the beginning of a "trend"?

---

[8] Only last Term in *Gregg* v. *Georgia,* 428 U. S. 153 (1976), MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS warned that "the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts," and noted that "we may not act as judges as we might as legislators," *id.,* at 174–175. Accord, *Roberts* v. *Louisiana,* 428 U. S. 325, 355–356 (1976) (WHITE, J., dissenting). MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS further noted that "[t]he deference we owe to decisions of the state legislatures under our federal system, [*Furman* v. *Georgia,* 408 U. S.,] at 465–470 (REHNQUIST, J., dissenting), is enhanced where the specification of punishments is concerned, *for 'these are peculiarly questions of legislative policy.' Gore* v. *United States,* 357 U. S. 386, 393 (1958)." 428 U. S., at 176. (Emphasis added.)

More to the point, however, it is myopic to base sweeping constitutional principles upon the narrow experience of the past five years. Considerable uncertainty was introduced into this area of the law by this Court's *Furman* decision. A large number of States found their death penalty statutes invalidated; legislatures were left in serious doubt by the expressions vacillating between discretionary and mandatory death penalties, as to whether this Court would sustain *any* statute imposing death as a criminal sanction.[9] Failure of more States to enact statutes imposing death for rape of an adult woman may thus reflect hasty legislative compromise occasioned by time pressures following *Furman,* a desire to wait on the experience of those States which did enact such statutes, or simply an accurate forecast of today's holding.

In any case, when considered in light of the experience since the turn of this century, where more than one-third of American jurisdictions have consistently provided the death penalty for rape, the plurality's focus on the experience of the immediate past must be viewed as truly disingenuous. Having in mind the swift changes in positions of some Members of this Court in the short span of five years, can it rationally be considered a relevant indicator of what our society deems "cruel and unusual" to look solely to what legislatures have *refrained* from doing under conditions of great uncertainty arising from our less than lucid holdings on the Eighth Amendment? Far more representative of societal mores of the 20th century is the accepted

---

[9] I take no satisfaction in my predictive caveat in *Furman:*

"Since there is no majority of the Court on the ultimate issue presented in these cases, the future of capital punishment in this country has been left in an uncertain limbo. Rather than providing a final and unambiguous answer on the basic constitutional question, the collective impact of the majority's ruling is to demand an undetermined measure of change from the various state legislatures and the Congress." 408 U. S., at 403 (dissenting opinion).

practice in a substantial number of jurisdictions preceding the *Furman* decision. "[The] problem . . . is the suddenness of the Court's perception of progress in the human attitude since decisions of only a short while ago." *Furman* v. *Georgia, supra,* at 410 (BLACKMUN, J., dissenting). Cf. *Rudolph* v. *Alabama,* 375 U. S. 889 (1963).

However, even were one to give the most charitable acceptance to the plurality's statistical analysis, it still does not, to my mind, support its conclusion. The most that can be claimed is that for the past year Georgia has been the only State whose adult rape death penalty statute has not otherwise been invalidated; two other state legislatures had enacted rape death penalty statutes in the last five years, but these were invalidated for reasons unrelated to rape under the Court's decisions last Term. *Woodson* v. *North Carolina,* 428 U. S. 280 (1976); *Roberts* v. *Louisiana,* 428 U. S. 325 (1976). Even if these figures could be read as indicating that no other States view the death penalty as an appropriate punishment for the rape of an adult woman, it would not necessarily follow that Georgia's imposition of such sanction violates the Eighth Amendment.

The Court has repeatedly pointed to the reserve strength of our federal system which allows state legislatures, within broad limits, to experiment with laws, both criminal and civil, in the effort to achieve socially desirable results. See, *e. g., Whalen* v. *Roe,* 429 U. S. 589, 597–598, and n. 22 (1977); *Johnson* v. *Louisiana,* 406 U. S. 356, 376 (1972) (opinion of POWELL, J.); *California* v. *Green,* 399 U. S. 149, 184–185 (1970) (Harlan, J., concurring); *Fay* v. *New York,* 332 U. S. 261, 296 (1947). Various provisions of the Constitution, including the Eighth Amendment and the Due Process Clause, of course place substantive limitations on the type of experimentation a State may undertake. However, as the plurality admits, the crime of rape is second perhaps only to murder in its gravity. It follows then that Georgia did not approach

such substantive constraints by enacting the statute here in question.  See also *infra*, at 619–622.

Statutory provisions in criminal justice applied in one part of the country can be carefully watched by other state legislatures, so that the experience of one State becomes available to all.  Although human lives are in the balance, it must be remembered that failure to allow flexibility may also jeopardize human lives—those of the victims of undeterred criminal conduct.  See *infra*, at 620.  Our concern for the accused ought not foreclose legislative judgments showing a modicum of consideration for the potential victims.

Three state legislatures have, in the past five years, determined that the taking of human life and the devastating consequences of rape will be minimized if rapists may, in a limited class of cases, be executed for their offenses.[10]  That these States are presently a minority does not, in my view, make their judgment less worthy of deference.  Our concern for human life must not be confined to the guilty; a state legislature is not to be thought insensitive to human values because it acts firmly to protect the lives and related values of the innocent.  In this area, the choices for legislatures are at best painful and difficult and deserve a high degree of deference.  Only last Term MR. JUSTICE WHITE observed:

"It will not do to denigrate these legislative judgments as some form of vestigial savagery or as purely retributive in motivation; for they are solemn judgments, reasonably based, that imposition of the death penalty will save the lives of innocent persons.  This concern for life and human values and the sincere efforts of the States to pursue them are matters of the greatest moment *with which the judiciary should be most reluc-*

---

[10] The statute here in question does not provide the death penalty for any and all rapes.  Rather, the jury must find that at least one statutorily defined aggravated circumstance is present.  Ga. Code §§ 26–3102, 27–2534.1 (b) (1), (2), and (7) (1977).

*tant to interfere." Roberts* v. *Louisiana, supra,* at 355 (dissenting opinion). (Emphasis added.)

The question of whether the death penalty is an appropriate punishment for rape is surely an open one. It is arguable that many prospective rapists would be deterred by the possibility that they could suffer death for their offense; it is also arguable that the death penalty would have only minimal deterrent effect.[11] It may well be that rape victims would become more willing to report the crime and aid in the apprehension of the criminals if they knew that community disapproval of rapists was sufficiently strong to inflict the extreme penalty; or perhaps they would be reluctant to cooperate in the prosecution of rapists if they knew that a conviction might result in the imposition of the death penalty. Quite possibly, the occasional, well-publicized execution of egregious rapists may cause citizens to feel greater security in their daily lives;[12] or, on the contrary, it may be that members of a civilized community will suffer the pangs of a heavy conscience because such punishment will be perceived as excessive.[13] We cannot know which among

[11] "The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. *Furman* v. *Georgia,* [408 U. S.,] at 403–405 (BURGER, C. J., dissenting)." *Gregg* v. *Georgia,* 428 U. S., at 186 (joint opinion of STEWART, POWELL, and STEVENS, JJ.).

[12] "There are many cases in which the sordid, heinous nature of a particular [rape], demeaning, humiliating, and often physically or psychologically traumatic, will call for public condemnation." *Furman* v. *Georgia,* 408 U. S., at 459 (POWELL, J., dissenting).

[13] Obviously I have no special competence to make these judgments, but by the same token no other Member of the Court is competent to make a contrary judgment. This is why our system has, until now, left these difficult policy choices to the state legislatures, which may be no wiser, but surely are more attuned to the mores of their communities, than are we.

618

this range of possibilities is correct, but today's holding forecloses the very exploration we have said federalism was intended to foster. It is difficult to believe that Georgia would long remain alone in punishing rape by death if the next decade demonstrated a drastic reduction in its incidence of rape, an increased cooperation by rape victims in the apprehension and prosecution of rapists, and a greater confidence in the rule of law on the part of the populace.

In order for Georgia's legislative program to develop it must be given time to take effect so that data may be evaluated for comparison with the experience of States which have not enacted death penalty statutes. Today, the Court repudiates the State's solemn judgment on how best to deal with the crime of rape before anyone can know whether the death penalty is an effective deterrent for one of the most horrible of all crimes. And this is done a few short years after MR. JUSTICE POWELL's excellent statement:

> "In a period in our country's history when the frequency of [rape] is increasing alarmingly, it is indeed a grave event for the Court to take from the States whatever deterrent and retributive weight the death penalty retains." *Furman* v. *Georgia,* 408 U. S., at 459 (dissenting opinion) (footnote omitted).

To deprive States of this authority as the Court does, on the basis that "[t]he current judgment with respect to the death penalty for rape . . . weighs very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman," *ante,* at 596, is impermissibly rash. The current judgment of some Members of this Court has undergone significant change in the short time since *Furman.*[14] Social change on great issues generally reveals itself in small increments, and the "current judgment" of many States could

---

[14] Indeed as recently as 1971—a year before *Furman*—a majority of this Court appeared to have no doubt about the constitutionality of the death penalty. See *McGautha* v. *California,* 402 U. S. 183 (1971).

well be altered on the basis of Georgia's experience, were we to allow its statute to stand.[15]

## (b)

The subjective judgment that the death penalty is simply disproportionate to the crime of rape is even more disturbing than the "objective" analysis discussed *supra*. The plurality's conclusion on this point is based upon the bare fact that murder necessarily results in the physical death of the victim, while rape does not. *Ante,* at 598–599, 600. However, no Member of the Court explains why this distinction has relevance, much less constitutional significance. It is, after all, not irrational—nor constitutionally impermissible—for a legislature to make the penalty more severe than the criminal act it punishes [16] in the hope it would deter wrongdoing:

> "We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved." *Gregg* v. *Georgia,* 428 U. S., at 175.

Accord, *Furman* v. *Georgia, supra,* at 451 (POWELL, J., dissenting).

It begs the question to state, as does the plurality opinion:

> "Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair." *Ante,* at 598.

---

[15] To paraphrase MR. JUSTICE POWELL, "[w]hat [the Court is] saying, in effect, is that the evolutionary process has come suddenly to an end; that the ultimate wisdom as to the appropriateness of capital punishment [for adult rape] under all circumstances, and for all future generations, has somehow been revealed." *Furman* v. *Georgia, supra,* at 430–431 (dissenting opinion).

[16] For example, hardly any thief would be deterred from stealing if the only punishment upon being caught were return of the money stolen.

Until now, the issue under the Eighth Amendment has not been the state of any particular victim after the crime, but rather whether the punishment imposed is grossly disproportionate to the evil committed by the perpetrator. See *Gregg* v. *Georgia, supra,* at 173, *Furman* v. *Georgia, supra,* at 458 (POWELL, J., dissenting). As a matter of constitutional principle, that test cannot have the primitive simplicity of "life for life, eye for eye, tooth for tooth." Rather States must be permitted to engage in a more sophisticated weighing of values in dealing with criminal activity which consistently poses serious danger of death or grave bodily harm. If innocent life and limb are to be preserved I see no constitutional barrier in punishing by death all who engage in such activity, regardless of whether the risk comes to fruition in any particular instance. See Packer, 77 Harv. L. Rev., at 1077–1079.

Only one year ago the Court held it constitutionally permissible to impose the death penalty for the crime of murder, provided that certain procedural safeguards are followed. Compare *Gregg* v. *Georgia, supra; Proffitt* v. *Florida,* 428 U. S. 242 (1976), and *Jurek* v. *Texas,* 428 U. S. 262 (1976), with *Roberts* v. *Louisiana,* 428 U. S. 325 (1976), and *Woodson* v. *North Carolina,* 428 U. S. 280 (1976). Today, the plurality readily admits that "[s]hort of homicide, [rape] is the 'ultimate violation of self.'" *Ante,* at 597. Moreover, as stated by MR. JUSTICE POWELL:

> "The threat of serious injury is implicit in the definition of rape; the victim is either forced into submission by physical violence or by the threat of violence." *Furman* v. *Georgia, supra,* at 460 (dissenting opinion).

Rape thus is not a crime "light years" removed from murder in the degree of its heinousness; it certainly poses a serious potential danger to the life and safety of innocent victims— apart from the devastating psychic consequences. It would

seem to follow therefore that, affording the States proper leeway under the broad standard of the Eighth Amendment,[17] if murder is properly punishable by death, rape should be also, if that is the considered judgment of the legislators.

The Court's conclusion to the contrary is very disturbing indeed. The clear implication of today's holding appears to be that the death penalty may be properly imposed only as to crimes resulting in death of the victim. This casts serious doubt upon the constitutional validity of statutes imposing the death penalty for a variety of conduct which, though dangerous, may not necessarily result in any immediate death, *e. g.,* treason, airplane hijacking, and kidnaping. In that respect, today's holding does even more harm than is initially apparent. We cannot avoid taking judicial notice that crimes such as airplane hijacking, kidnaping, and mass terrorist activity constitute a serious and increasing danger to the safety of the public. It would be unfortunate indeed if the effect of today's holding were to inhibit States and the Federal Government from experimenting with various remedies—including possibly imposition of the penalty of death—to prevent and deter such crimes.

---

[17] MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS in *Gregg* v. *Georgia* noted: "[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure [of the Eighth Amendment], we presume its validity. . . . [*A*] *heavy burden rests on those who would attack the judgment of the representatives of the people.*" 428 U. S., at 175 (emphasis added). Accord, *Furman* v. *Georgia, supra,* at 451 (POWELL, J., dissenting).

The reason for this special deference to state legislative enactments was described:

"This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' *Furman* v. *Georgia,* [408 U. S.,] at 383 (BURGER, C. J., dissenting)." 428 U. S., at 175–176.

Some sound observations, made only a few years ago, deserve repetition:

> "Our task here, as must so frequently be emphasized and re-emphasized, is to pass upon the constitutionality of legislation that has been enacted and that is challenged. This is the sole task for judges. We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great. In fact, as today's decision reveals, they are almost irresistible." *Furman* v. *Georgia,* 408 U. S., at 411 (BLACKMUN, J., dissenting).

Whatever our individual views as to the wisdom of capital punishment, I cannot agree that it is constitutionally impermissible for a state legislature to make the "solemn judgment" to impose such penalty for the crime of rape. Accordingly, I would leave to the States the task of legislating in this area of the law.