# Constitutionality of Statute Imposing Death Penalty for Attempted Assassination of the President

Under applicable Supreme Court precedent, a statute making it a capital offense to attempt to assassinate the President would be unlikely to survive constitutional challenge, unless it were narrowly drawn to include only cases in which the defendant's intent was unambiguous and the attempt nearly successful.

Both historical precedent and contemporary practice in this and other countries suggest that death would ordinarily be regarded by a court as an excessive punishment for the crime of attempted murder. On the other hand, the unique position of the President in our constitutional system, coupled with the threat to the national security which an assault on his person would constitute, may warrant subjecting the crime of attempted assassination of the President to the death penalty

April 30, 1981

## MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CRIMINAL DIVISION

This responds to your request for the views of this Office with respect to the constitutionality of a proposed statute imposing the death penalty for the offense of attempted assassination of the President.[1] For the reasons that follow, we believe that such a statute, if drafted narrowly and with extreme care, might well be upheld by the Supreme Court. We must caution, however, that the question is an extremely close and difficult one on which the Supreme Court has given little guidance, and that the outcome of a challenge to the law may well depend on the particular factual context to which it is applied.

### I. Background

Prior to considering the issues raised, it may be helpful briefly to review recent Supreme Court decisions on capital punishment. In *Furman* v. *Georgia,* 408 U.S. 238 (1972), a five-Justice majority ruled in a per curiam opinion that the imposition of the death penalty in the

---

[1] A variety of federal statutes currently impose the death penalty *See* 18 U.S C. § 34 (destruction of motor vehicles or motor vehicle facilities where death results); 18 U S.C. § 351 (assassination or kidnapping of a Member of Congress); 18 U S.C. § 794 (gathering or delivering defense information to aid a foreign government); 18 U S.C. § 1111 (murder in the first degree within the special maritime and territorial jurisdiction of the United States), 18 U.S.C. § 1716 (causing death of another by mailing injurious articles); 18 U.S.C. § 1751 (murder or kidnapping of a President or Vice President); 18 U S C. § 2031 (rape within the special maritime or territorial jurisdiction of the United States), 18 U.S.C § 2381 (treason); 49 U.S.C. § 1472(i) (aircraft piracy where death results).

116

cases before the Court would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[2] Two of those Justices were of the opinion that capital punishment is *per se* unconstitutional.[3] The remaining three Justices did not reach the question whether the death penalty is unconstitutional in all circumstances. Justice Douglas concluded that the discretionary statutes in question were "pregnant with discrimination" in their operation and thus violated the Equal Protection Clause of the Fourteenth Amendment.[4] Justice Stewart objected to the penalty being applied "so wantonly and so freakishly." [5] Justice White concluded that as the statutes were administered, they violated the Eighth Amendment because the penalty was so infrequently imposed that the threat of execution was too attenuated to be of substantial service to criminal justice.[6]

In *Gregg* v. *Georgia,* 428 U.S. 153 (1976), the Court reviewed the Georgia statute enacted in response to *Furman* and found it sufficient to overcome Eighth Amendment objections. 428 U.S. at 207.[7] Justices Stewart, Powell, and Stevens found four features of the statute to be particularly important: (1) the sentencer's attention was drawn to the particularized circumstances of the crime and of the defendant by reference to aggravating and mitigating factors; (2) the discretion of the sentencer was controlled by clear and objective standards; (3) the sentencer was provided with all the relevant evidence during a separate sentencing hearing, while prejudice to the defendant was avoided by restricting information on aggravating circumstances to that comporting with the rules of evidence; and (4) there was a system of appellate review of the sentence to guard against arbitrariness, excessiveness, and disproportionality. In a separate opinion, Chief Justice Burger and Justices White and Rehnquist concurred in the judgment. 428 U.S. at 207.

In *Lockett* v. *Ohio,* 438 U.S. 586 (1978) and the companion case, *Bell* v. *Ohio,* 438 U.S. 637 (1978), the Court again considered the constitutionality of a state statute enacted in response to *Furman.* The Ohio statute at issue also set forth the aggravating and mitigating factors to be considered in the imposition of the death penalty. If the case went to trial, however, the law provided that only three mitigating factors could be considered. Without a finding of one of these factors, and with a finding of an aggravating factor, imposition of the death penalty was mandatory. While the Court by a vote of seven to one found the imposition of the death penalty in this case to be unconstitutional, again there was no majority opinion.

---

[2] *Furman* v *Georgia,* 408 U.S. 238, 239–40 (1972).
[3] 408 U.S. at 257 (Brennan, J., concurring), 408 U.S. at 314 (Marshall, J., concurring)
[4] 408 U.S. at 256–57
[5] 408 U S. at 310.
[6] 408 U.S. at 312–13.
[7] In companion cases, *Woodson* v. *North Carolina,* 428 U.S. 280 (1976), and *Roberts* v *Louisiana,* 428 U.S 325 (1976), a plurality ruled that imposition of mandatory death sentences violated the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments.

Chief Justice Burger and Justices Stewart, Powell, and Stevens based their decision on the conclusion that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." [8] Justice Marshall adhered to his view that the death penalty is unconstitutional in all circumstances. Justice Blackmun found that the application of the penalty to an aider and abettor without regard to a specific *mens rea* in relation to the killing would be cruel and unusual. He also found that the statute violated the rule set down in *United States* v. *Jackson,* 390 U.S. 570 (1968), in that it permitted a judge who accepted a guilty plea to avoid imposing the death penalty "in the interests of justice," but authorized consideration of only three mitigating factors if a defendant asserted his constitutional right to a trial. [9] Finally, Justice White objected to the Ohio statute because it included an aider and abettor within the scope of the death penalty without a finding that the defendant "engaged in conduct with the conscious purpose of producing death." [10]

The Court has also held that, in addition to requiring certain procedural safeguards for imposition of the death penalty, the Eighth Amendment bars the death penalty if it is excessive in relation to the crime committed. *Coker* v. *Georgia,* 433 U.S. 584 (1977). In *Coker,* discussed in more detail below, the Court concluded that the death sentence for rape of an adult woman when death did not result was disproportionate to the crime. 433 U.S. at 592.

Recently, the Court again reviewed a death sentence imposed under the Georgia statute. In *Godfrey* v. *Georgia,* 446 U.S. 420 (1980), the Court considered whether the Georgia Supreme Court had adopted such a broad and vague construction of one of the statutory aggravating circumstances as to violate the Eighth and Fourteenth Amendments. The statute provided that a person could be sentenced to death if the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code Ann. § 27–2534.1(b)(7) (Supp. 1975). In the plurality opinion written by Justice Stewart, joined by Justices Blackmun, Powell, and Stevens, the Court ruled that in upholding Godfrey's sentence, the Georgia Supreme Court did not apply a constitutional construction of (b)(7). Justice Stewart stated: "There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." 446 U.S. at 433. In a concurring opinion, Justice Marshall, joined by Justice Brennan, ad-

---

[8] *Lockett* v. *Ohio,* 438 U.S. 586, 604 (1978).
[9] 438 U.S. at 613–14, 618–19.
[10] 438 U.S. at 627–28.

hered to his view that the death penalty is unconstitutional in all cases, and, in addition, agreed with the plurality that the Georgia Supreme Court's construction of (b)(7) in this case was unconstitutionally vague. He suggested that the sentencing procedures of the type approved in *Gregg* are doomed to failure because the criminal system is incapable of guaranteeing objectivity and evenhandedness in application of the death penalty. Chief Justice Burger and Justices Rehnquist and White dissented, warning that the Court should not put itself in the role of second-guessing state judges and juries.

## II. Constitutionality of the Proposed Statute

The Court's ruling in *Coker,* that the death penalty is unconstitutionally excessive in relation to the crime of rape of an adult woman, raises the question whether the death penalty is excessive in relation to any crime in which death does not result.[11]

In *Coker,* Justice White, speaking for the plurality, characterized the test first enunciated in *Gregg* as: (1) whether the sentence makes a measurable contribution to acceptable goals of punishment; and (2) whether the sentence is grossly out of proportion to the crime. 433 U.S. at 592. The plurality examined the position taken by those states which had reinstated the death penalty after *Furman* and concluded that the modern approach was not to impose the death penalty for rape. It then brought its own judgment to bear on the question of the acceptability of the death penalty under the Eighth Amendment. It reasoned:

> Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, rape by definition *does not include the death of or even the serious injury to another person.* The murderer kills; the rapist, if no more than that, does not. Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair. We have the abiding conviction that the death penalty, which "is unique in its severity and irrevocability," *Gregg* v. *Georgia,* 428 U.S. at 187, *is an excessive penalty for the rapist who, as such, does not take human life.*

---

[11] In his dissent in *Coker,* Chief Justice Burger wrote: "The clear implication of today's holding appears to be that the death penalty may be properly imposed only as to crimes resulting in death of the victim. This casts serious doubt upon the constitutional validity of statutes imposing the death penalty for a variety of conduct which, though dangerous, may not necessarily result in any immediate death, *e.g.,* treason, airplane hijacking, and kidnapping." *Coker* v. *Georgia,* 433 U.S. 584, 621 (1978).

433 U.S. at 598 (emphasis added). The fact that one of the statutory aggravating circumstances had to be found before the death penalty could be imposed did not convince the plurality that the penalty was not excessive. It wrote that the aggravating circumstances "do not change the fact that the instant crime being punished is a rape not involving the taking of life." 433 U.S. at 599.

Justices Brennan and Marshall concurred separately, reiterating their views that the death penalty is unconstitutional *per se.* Justice Powell concurred in the judgment that the death penalty was not appropriate in this case but dissented from that portion of the plurality opinion which suggested that the death penalty for rape would be excessive in all cases. Chief Justice Burger and Justice Rehnquist joined in dissent.

Under the analysis suggested in *Coker,* in order to determine whether the imposition of the death penalty is constitutional with respect to the offense of attempted assassination of the President, one must determine, first, whether it makes a measurable contribution to acceptable goals of punishment and, second, whether it is excessive in proportion to the crime. While there is as yet no final resolution of the debate over the deterrent effect of the death penalty, we believe that a court would give deference to the legislative judgment on the deterrent effect as long as this judgment appears reasonable.

The second part of the test, whether the punishment is excessive with respect to the crime, is more difficult to apply. In *Coker,* the Court looked to the consensus among the states and the practice of juries in modern times, as well as to historic practice, to assess the relationship between the penalty and the offense. This inquiry is more difficult with respect to a crime as rare as attempted assassination of the President. We approach the issue by considering five factors that bear on the inquiry mandated by *Coker.* Those factors are: (1) the general definition of "attempt"; (2) the historical approach to "attempt" crimes, especially murder; (3) the federal and state practice with respect to attempted murder of the President; (4) the international treatment of attempted assassination of national leaders; and (5) the special position of the President of the United States.

A. *Definition of attempt.* We do not have before us a definition of the kinds of attempts on the life of the President to which the death penalty would be applied. A wide range of conduct might constitute an attempted murder. Different mental states and different conduct, marking varying degrees of progress toward the completion of the crime, might be comprehended within the definition. *See* S. Kadish & M. Paulsen, Criminal Law and its Processes: Cases and Materials 368–410 (1969). Under the Model Penal Code, for example, "A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

120

(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

(b) when causing a particular result is an element of the crime, does . . . anything with the purpose of causing or with the belief that it will cause such result, without further conduct on his part; or

(c) purposely does . . . anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

Model Penal Code, Proposed Official Draft § 5.01(1), (1962). To constitute a "substantial step" under § (1)(c), the step must be "strongly corroborative of the actor's criminal purpose."

In our view, a statute making it a capital offense to attempt to assassinate the President will be much more likely to be held constitutional if it covers a limited category of situations in which the attempt has nearly succeeded and the defendant's intent is unmistakable. *See Lockett* v. *Ohio,* U.S. 438 at 627–28 (White, J., concurring) (intent to murder must be shown to justify imposition of death sentence). For this reason, we believe that the Court would be much more likely to uphold the application of the death penalty to conduct falling within categories (a) and (b) above than (c). At the same time, we do not exclude the possibility that conduct falling within (a) or (b) might itself not be subject to capital punishment under the Eighth Amendment, especially if the crime was not in fact nearly completed. For purposes of the following discussion, we assume that any statute to be enacted by Congress would be narrowly drawn and limited to cases of unambiguous motive and near-completion of the assassination effort.

B. *Attempted murder in general.* Anglo-American law has traditionally subjected crimes of attempt, including attempted murder, to a lower penalty than the completed crime. At common law, all attempts were classified as misdemeanors. W. Clark & W. Marshall, A Treatise on the Law of Crimes 178 (2d ed. 1905). Under current statutory provisions, an attempt is ordinarily punishable by a reduced factor of the punishment for the completed crime. S. Kadish & M. Paulsen, *supra,* at 368 (1969). A few states make the punishment for the completed crime the same as for attempts, but even those states reduce an attempt to commit a capital offense to a term of imprisonment. *Id.* Under the Model Penal Code, an attempt is generally a crime of the same grade and degree as the substantive offense, but an attempt to commit a capital crime or a first-degree felony is a felony of the second degree. Model Penal Code § 5.05(1) (Proposed Official Draft 1962). Our review indicates that none of the states now having capital punishment laws classifies attempted murder as an offense subject to the death penalty.

121

This pattern apparently reflects a deeply seated social conception that attempted crimes should not be punished as severely as substantive offenses. That conception has been said to result from a number of factors. First, if the purpose of punishment is retribution, that purpose points toward a less severe sanction for attempts. *See* Waite, The Prevention of Repeated Crime 8–9 (1943). Second, if the act has not been carried out, there is inevitably some room for uncertainty as to the actor's true motives. Finally, it has been doubted whether the threat of punishment for attempts will add significantly to the deterrent effect of the sanction threatened for the substantive offense which, by hypothesis, the actor has ignored. Model Penal Code, comments to § 5.05 (Tent. Draft No. 10, 1950).

These factors, when considered in conjunction with the historical practice of penalizing attempts less severely than substantive offenses, suggest that, under *Coker,* a capital punishment law for attempted murder may well be invalidated. The objective factors relied on by the Court indicate that the retributive and deterrent goals of punishment point toward a more severe penalty for murder than for attempted murder.

It should be noted, however, that attempted murder of the head of state was punished quite severely at common law. In England, an attempt on the life of the King was regarded as a form of common law treason and thus punishable by death. W. Burdick, The Law of Crime, § 231 (1946); R. Perkins, Criminal Law 441 (1969); W. Clark & W. Marshall, *supra,* at 7. The Statute of Treasons, enacted in 1351, included a manifested desire for the death of the King as an act of high treason. The American Constitution, however, contains provisions designed to limit the definition of the crime, stating, "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort." U.S. Const., Art. III, § 3. The offense of attempting to assassinate the President has not, to our knowledge, been thought to fall within this language.

C. *Historical practice in America.* The first federal statute making it a federal crime to assassinate or to attempt to assassinate the President was passed in 1965. 18 U.S.C. 1751. Under that provision, the maximum sentence for an attempt on the life of the President is life imprisonment. Accordingly, the federal government has not, as an historical matter, made it a capital offense to attempt to assassinate the President. This factor would be cited to support the argument that a death penalty for such an attempt is unconstitutional under the Eighth Amendment. It is not, however, dispositive. Moreover, since no provision of federal law prior to 1965 governed assassination of the President, Congress did not before that time conclude that a person convicted of an attempted assassination should *not* be subject to the death penalty.

122

Since no federal law governed assassination or attempted assassination of the President before 1965, several states enacted provisions on the subject. Our preliminary [12] research indicates, however, that very few states made it a capital offense to attempt to assassinate the President. Only Connecticut, Ohio, and probably New Jersey had such laws in 1967, before the *Furman* decision. H. Bedau, The Death Penalty in America 48–52 (rev. ed. 1967). There is, therefore, only minor support for the position that, in the United States, attempted assassination of the President has been regarded as a crime for which the death penalty is appropriate.

D. *International practice.* The Economic and Social Council of the United Nations undertakes a report on the capital punishment laws of its members every five years. The last report, completed in 1980, contains somewhat vague and incomplete data compiled on the basis of the replies from 74 member states (of a total current membership of 154). Of the countries responding, only nine stated with clarity that those committing the offense of attempted assassination of the head of state were subject to capital punishment: Morocco, Tunisia, Indonesia, Belgium, Mozambique, Philippines, Thailand, Nepal, and France. [13] If correct, these data suggest that a small percentage of the nations with capital punishment laws apply those laws to attempts on the head of state. Although not binding on the Court's interpretation of the U.S. Constitution, that fact would count as a factor in determining whether an attempted assassination of the President may be subjected to capital punishment, for it suggests a general international position that a person who has only attempted to assassinate a head of state should not be executed.

E. *Nature of crime.* Finally, we consider the nature of the crime involved here: An attempted assassination of the President. As the most powerful and visible of the Nation's leaders, the President maintains a unique position within the federal government. As Commander-in-Chief of the Armed Forces, he discharges unique responsibilities for the security of the country. As head of the Executive Branch, he is entrusted with the authority of coordinating and executing all laws of the United States. For these reasons, an assault on the President threatens the national security in a distinctive fashion. Even if the attempt is unsuccessful, it may produce a national sense of embarrassment, fear, or trauma. An attempt on the life of the President is, as a result, different in kind, not merely in degree, from an attempt on the life of any other

---

[12] Since the available historical materials are generally vague, we cannot exclude the possibility that our data is incomplete.

[13] Numerous others, however, included treason as a capital offense. If treason were defined to include attempted assassination of the head of state, the number would be significantly higher. That information, however, is not currently available. U N. Economic and Social Council, *Capital Punishment: Report of the Secretary General,* para. 34, U.N. Doc E/1980/9 (1980); para. 4, U.N. Doc E/1980/9/Add 1 (1980)

public or private citizen. In this respect, the President is a "legitimate class of one." *Nixon* v. *Administrator of General Services,* 433 U.S. 425, 472 (1977).

We believe that the unique nature of the office of the President of the United States furnishes support for the view that an attempted assassination of the President can be subjected to the death penalty. More than any other attempt crime, an attempt on the life of the President causes injury to the country even if it is unsuccessful. There is a substantial governmental interest in avoiding the national injury that is produced simply by virtue of an attempt on the President's life.

### III. Conclusion

The foregoing discussion suggests that, under *Coker,* a statute making it a capital offense to attempt to assassinate the President would raise quite serious constitutional questions. Throughout American history, attempt crimes have been punished less severely than substantive offenses. Although an assassination attempt was within the definition of treason in England, it has not been so regarded in the United States. No American jurisdiction currently applies the death penalty to an attempted murder. The only federal statute governing attempted assassination of the President was enacted in 1965 and carries a maximum sentence of life imprisonment. On the basis of the evidence now available to us, it appears that only a handful of states applied the death penalty to attempt on the life of the President before *Furman.* Finally, although the evidence is somewhat vague, it seems that relatively few countries, even among those that retain the death penalty, punish with death the offense of attempting to assassinate the head of state.

On the other hand, such an attempt is undoubtedly a grave offense and amounts to an assault on the security of the Nation; this indicates that a narrowly drawn statute might be upheld against an attack on the basis of *Coker.*

Taken together, these factors suggest that a broadly drawn death penalty for attempts on the life of the President would be unlikely to survive constitutional challenge. Any such statute should be narrowly drafted to include cases in which the defendant's intent was unambiguous and the crime was almost completed. Such a statute would be more likely to be upheld if an element of the crime was the actual commission of some bodily injury to the President.

We believe that, if a capital punishment statute were drafted to include such injury as part of the offense, or possibly even if it were otherwise narrowly confined to nearly successful attempts, the statute might well be found constitutional. The fact that England and a number of other countries have historically applied the death penalty to an attempted murder of the head of state, together with the distinctive responsibilities of the President in our constitutional scheme, do, in our

view, provide support for a conclusion that the death penalty for an attempt on the life of the President is not disproportionate within the meaning of *Coker.* We must caution, however, that the constitutional question is a serious and difficult one, and that our position is necessarily tentative in light of the inconclusive nature of the Supreme Court's guidance.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*