MR. JUSTICE SHEEHY,
dissenting:
I dissent principally on two grounds, one, that the court committed instructional error with respect to mental disease or defect, and two, that the sentence imposed is cruel and unusual punishment.
I.
For the reader to understand this issue, I set out the provisions of Section 46-14-101, MCA:
“Mental disease or defect. As used in this chapter, the term ‘mental disease or defect’ does not include an abnormality manifested only by repeated criminal or other antisocial conduct.”
The obverse of Section 46-14-101, should be that mental disease or defect does include abnormalities manifested by other than repeated criminal or other antisocial conduct.
*425 Everybody that has had anything to do with this case admits that the defendant is suffering, at least medically, from a mental disease or defect. All the experts who testified at the trial agreed on this point. The state prosecutors at the county and state level agree, the District Court agreed, and now this Court, through its majority opinion also agrees. In that situation, we must ask ourselves whether the jury was properly instructed so that it could determine whether at the time he committed the alleged offense he was suffering from a mental disease or defect so that he could not have the particular state of mind that is an essential element of the offense charged.
The court’s instruction on this point is as follows:
“INSTRUCTION NO. 20”
“You must decide 1. whether the defendant had a mental disease or defect at the time of the acts alleged in the information before you, and 2. whether, if he had a mental disease or defect, it prevented him from having any of the states of mind required as an element of the offense charged, in this case, purpose or knowledge.
“You are to determine the meaning of the phrase ‘mental disease or defect,’ and in so doing you may apply the common meaning of these words and your experience in life, and you may be guided by the testimony you find credible and relevant. However, the term ‘mental disease or defect’ does not include an abnormality manifested only by repeated criminal or other antisocial conduct.” (Emphasis added.)
Obviously, as far as it went, the instruction is in accord with Section 46-14-101, MCA. However, the defense offered a clarification to the instruction which would have added the following language:
“As used in this instruction, the terms mental disease or defect do not include an abnormality manifested only by repeated criminal or anti-social conduct. However, if you find there is other evidence that the defendant had a *426 mental disease or defect, you may consider repeated criminal or anti-social conduct as a manifestation of a mental disease or defect.”
The District Court denied the addition to the instruction as proposed by the defendant. I think a serious error occurred at this point.
This is not spoken in criticism of the district judge. I think the District Court was faced with a statute that is too vague and ambiguous to be applied. The point that the defendant’s offered instruction was hoping to meet is this: if the only manifestation of the abnormality is repeated “criminal or other antisocial conduct” then the jury may not consider that the defendant acted under the influence of a mental disease or defect; but it in fact there are other manifestations of abnormality, as all agree there are in this case, then the jury may consider the repeated criminal and antisocial conduct as further manifestation of the abnormality.
The term “other antisocial conduct” itself is too broad to be constitutionally applied. Criminal conduct is, of course, antisocial. What other conduct may be regarded as antisocial? By definition, one who is averse to the society of others is antisocial. The term also includes behavior which is hostile or harmful to organized society or which is marked by behavior deviating sharply from the social norm. Webster’s New Collegiate Dictionary (1981). Thus, antisocial conduct runs the broad spectrum from criminal conduct through vandalism and even to those Montanans who “like their fellow men the best when they are scattered some.”
The term “antisocial conduct” is too broad and vague to be constitutionally applied. Without a standard to guide the jury based on the clause, the jury was left with no guidance in the application of the law to the abnormality claimed by the defendant. The instructions given to the jury were in effect a presumption in the vice of Sandstrom, because some jurors may have excluded all of the defendant’s abnormal behavior as antisocial, and therefore not to *427 be considered as a manifestation of his mental disease or defect.
It is true that the defendant did not offer, as I search the record, an instruction defining “antisocial conduct” in the sense of the statute. Undoubtedly the defendant could not have found such a standard, but at least the clarification offered should have been given to the jury that if the defendant did engage in conduct which was abnormal, then the jury might also consider his repeated criminal violations, and his repeated “antisocial conduct.”
There is a serious statutory hole here that requires filling up by the legislature. In the meantime, it is the duty of this Court to protect the defendant from the consequences of the District Court taking from the jury all consideration of abnormal behavior simply because it falls within the categories of criminal or antisocial conduct.
II.
As serious to me as the instructional error is the punishment meted out to the defendant here, three 100 year terms to be served consecutively, without possibility of furlough or parole.
It is evident that the District Court decided to put the defendant “on ice” for the remainder of his life. Worse, he will be preserved in his present state, without hope of treatment until death overtakes him. To me, this is cruel and unusual punishment.
Punishment for crimes may be “cruel and unusual” because of its barbarity, or because it is “excessive” or “disproportionate” to the offense. Solem v. Helm (1983), 462 U. S__; 103 S.Ct. 3001, 77 L.Ed.2d 837; Edmund v. Florida (1972), 458 U.S. 782,102 S.Ct. 3368, 73 L.Ed.2d 1140; Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982; Estelle v. Gamble (1977), 429 U.W. 97. 97 S.Ct. 285, 50 L.Ed.2d 251; Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859.
The term “cruel and unusual punishment” comes from the *428 Eighth Amendment to the United States Constitution. The Eighth Amendment is based upon the “evolving standards of decency that mark the progress of a maturing society.” Trop v. Dulles (1958), 356 U.S. 86, 101, [79] S.Ct. [590], [2] L.Ed.2d [630]. Montana, in adopting its 1972 Constitution, purportedly showed it was maturing by adopting Art. II, Section 28 to the effect that laws for the punishment of crime shall be founded on the principles of prevention and reformation. Punishment, therefore, ought to have a two-pronged objective: one, preventing the defendant from further crime, but two, directed toward Ms rehabilitation. By salting the defendant away for the rest of his natural life, the court has undoubtedly prevented him from future crime against persons outside the prison walls; but the District Court has also determined that he is incapable of rehabilitation. The only evidence of his inability to rehabilitate is his mental illness. That is why by sentencing him to the Montana State Prison instead of to Warm Springs, the District Court insured that he would never be rehabilitated through medical treatment. From the sentence, therefore, I determine that its imposition is at once barbarous and excessive.
As the appellant noted in his brief, the sentence is also disproportionate. Statistics compiled by the Sentence Review Board of our Court in 1980 show that of the 352 convictions for aggravated assault between July 1, 1978 and December 12, 1979, only six individuals received prison terms in excess of 20 years. The defendant was given 100 years, pursuant to the persistent felony offender statute without possibility of parole or furlough for his conviction on the charge of aggravated assault against Andrew Floberg. Likewise, 947 people were convicted of burglary between July 1, 1978 and December 12, 1979. Of those 947, 3 received sentences of 40 to 50 years, probably under the persistent felony offender statutes. None received sentences in excess of 50 years. The defendant, however, received a sentence of 100 years without the possibility of parole or *429 furlough on his burglary conviction for entering Melissa Smith’s apartment and stealing her purse. The Sentence Review Board compiled no statistics for the offense of attempted deliberate homicide in its 1980 report. I think it rather obvious that the sentences here are disproportionate and I would reverse on that ground also.
I would reverse the conviction and remand for a new trial.
MR. JUSTICE SHEA dissents and will file a written dissent later.