# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D21-2981
_____

KENNETH BICKING III,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____


On appeal from the Circuit Court for Duval County.
Adrian G. Soud, Judge.

September 22, 2022


PER CURIAM.

AFFIRMED.

BILBREY and WINOKUR, JJ., concur; B.L. THOMAS, J., concurs with opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

B.L. THOMAS, J., concurring.

I concur with the Court's decision affirming the ruling of the trial court denying Appellant's motion for post-conviction relief filed under Florida Rule of Criminal Procedure 3.850. I write to acknowledge the barbarity and cruelty of Appellant's aggravated armed rape (sexual battery) and kidnaping that inflicted permanent trauma and suffering on his victim. The trauma and suffering that Appellant's crime inflicted on the victim twenty-two years before the trial were so egregious that the jury found that the rape and the kidnapping inflicted continued trauma on the victim based on her testimony in a bifurcated sentencing proceeding. The trial court specifically found based on the jury's supplemental verdicts that the rape and kidnapping were heinous, atrocious, and cruel and that the victim suffered continuous emotional trauma from the 1992 crime.

DNA evidence conclusively proved that Appellant's DNA was present in the victim's body, to a degree of 1 in 120 quadrillion Caucasians. The victim testified she never had consensual sexual intercourse with Appellant. Other evidence corroborated the victim's testimony, confirmed Appellant's guilt, and was consistent with the victim's observations of Appellant. Appellant himself testified that he "apparently had sexual intercourse" with the victim, but "could not remember it," which was patently false.

Because of the dedicated work of the Atlantic Beach Police Department in Duval County, a retired detective who had investigated the case when Appellant committed the rape in 1992 contacted the Department almost twenty years later and recommended that all forensic evidence be resubmitted for DNA analysis. Because DNA technology had significantly improved, and because Appellant's DNA profile was by then registered in databases due to his subsequent felony arrest, the DNA match was produced which resulted in this conviction.

All of this evidence confirmed Appellant's guilt beyond a shadow of a doubt and certainly beyond any reasonable doubt. The jury returned a verdict in 24 minutes. Based on this, Appellant cannot show the required legal prejudice from any alleged ineffectiveness of trial counsel to entitle him to constitutional relief

2

under the Sixth Amendment to the United States Constitution under *Strickland v. Washington*, 466 U.S. 668 (1984). No competent or even highly skilled defense counsel could possibly have provided legal representation that would have resulted in Appellant's acquittal, and Appellant's counsel provided competent and constitutionally satisfactory representation. Thus, summary denial of his claims was correct.

I write also because in my view, respectfully, the United States Supreme Court's decision barring capital punishment for the rape of an adult was wrongly decided. That decision was not based on the text of the Constitution or the historical underpinnings of the Eighth Amendment. Should a state determine that the death penalty is an appropriate punishment for aggravated armed sexual battery or the sexual battery of a child, the United States Supreme Court, given the opportunity, should reconsider its erroneous non-unanimous plurality decision in *Coker v. Georgia,* 433 U.S. 584 (1977), and the five-to-four decision in *Kennedy v. Louisiana,* 544 U.S. 407 (2008), and hold that such sentences under certain circumstances are valid and legitimate exercises of the states' police power to punish the violent rapes that plague society, as consistent with the historical understanding of the Eighth Amendment and consistent with legitimate state retribution and moral proportionality for these heinous, atrocious, and cruel crimes that violate the  human dignity of rape victims and inflict a lifetime of permanent pain and suffering, as evidenced in this case.

*Appellant's Armed Rape and Kidnapping of the Victim*

On a pleasant day in April 1992, Appellant's victim was washing her car in the early afternoon. She noticed a man riding a bicycle with an empty child seat attached. She noted that the man was in "disguise," but because she saw the child seat and she lived across the street from the Atlantic Beach Police Station and in a "nice" neighborhood with retired couples and people walking their dogs, the victim took no further notice.

A neighbor also noted the man riding slowly past the victim's home. This witness testified that she too thought it odd the man seemed to be in disguise. The witness later saw the man on the

bicycle ride quickly away from the victim's back yard, which happened after Appellant raped the victim.

The victim finished washing her car. She then went into her home to do chores, leaving a garage door open to allow the spring breeze into her home. She listened to loud music. As she was finishing her chore, she turned and saw Appellant, wearing a mask, pointing a gun in her face. He told her that he would kill her if she did not comply with his orders and stay quiet. Appellant ordered her to get on the floor on her stomach.

The victim cried and begged Appellant to take her jewelry, anything he wanted, and just leave. Appellant again told her to "shut up" after he stole some of the victim's jewelry. He repeatedly warned the victim to stop crying.

Appellant proceeded to pull rope and a blindfold out of his rape bag, which he used to tie up the victim's hands behind her back. He then taped the victim's eyes, demanding to know if she could see anything. While the victim could make out some details about Appellant's facial hair, leg hair, and shoes, the victim told Appellant she could not see anything. She could see part of his facial hair after he made her lay on her back. Desperately realizing that she could be murdered, the victim told Appellant that her boyfriend had only left to look at the waves and could be back any moment. She told Appellant that she did not want anyone to get hurt.

Fearing this possible development, Appellant kidnapped and forced the victim to walk up the stairs into her bedroom. He made her lie on the floor on her back. She testified that:

> I started thinking that I'm going to remember every last detail of this person that I can if there is ever an opportunity to catch him if I made it through, and I didn't want him to know that I could see, so I acted like I couldn't, but I could see.

The victim correctly identified Appellant's clean Topsiders, shoes he often wore according to his ex-wife who testified. The

victim also correctly identified mirrored sunglasses, a baseball cap, and a Hawaiian shirt he wore.

Once Appellant had the victim in her bedroom, he made her lay on the floor of her bedroom with her hands tied behind her back. He opened the blinds on her window so he could see the road and look for the victim's boyfriend while he raped her. The victim could hear Appellant "rummaging" through his rape bag while she cried and begged him to leave. But Appellant just kept telling her to "shut up and be quiet and he would not hurt her."

The victim testified that the rape occurred quickly because she thought Appellant was "fearful that my boyfriend was going to come back." After raping her, Appellant:

> [R]olled me over and *tied my ankles and taped mouth* and instructed me not to move *or that he would come back and kill me,* and so I laid there . . . . I laid there and I said, No one is going to find me, I'm going to be here all day like this and this guy is going to get away, what am I going to do? And I just said—I listened—I listened to see if I could hear a door close, him leaving or anything like that, because I was afraid he might still be watching me to see if I really moved. I didn't—you know, *I didn't want him to shoot me.* I was very scared. But, um, I didn't hear anything. I just didn't know what to do so—I don't know how much time went by, but I  know it wasn't long, and somehow I was able to get onto my knees and I made my way on my knees to my bathroom that was connected to my bedroom, and I have a vanity, a solid front vanity that I was trying to rub my face—well, I did, I rubbed my face to loosen the tape on my mouth and my eyes a little bit more. Um, and then I made my way over to my nightstand, which had a phone on it. There were no cell phones back then, and, um, I was able to turn around and grab the receiver and throw it on the ground, and I had removed—flipped the tape back enough where I could speak and  see a little bit more with turning on my back and trying to dial 911 with my hands tied, and then, um, I laid on the ground and talked into the phone and said that I had been assaulted, and the lady talked to me till

the police got there, and I could hear—I could hear all the sirens and everything while I laid there and cried into the phone.

And I remember the police officer—I remember them on the phone telling me that a police officer was going to enter my room, and I remember him saying that he was going to lay a towel over me.

(emphasis added).

After recounting the terror to the police officer, Detective Vanderwal, who later acted in retirement to ask the Department to resubmit the victim's DNA evidence, took the victim to the hospital to undergo a sexual-assault examination. She was not allowed to shower before the examination which felt like "another violation" that was so "traumatic and uncomfortable," but the victim was determined to do everything she could to help law enforcement apprehend Appellant.

The victim never stayed in her home again, and her roommate moved out as well.

The victim stayed that night with her boyfriend. When the victim returned to gather her possessions the next day, she observed Appellant's gun holster on the ottoman that had been covered up by her laundry and not discovered by the police. She also identified the rope Appellant had used to tie her up and the tape he put on her mouth and eyes. She also identified the bathing suit that Appellant had removed to rape her.

The victim then looked at Appellant in the courtroom and testified that she had never had consensual sex with Appellant. On redirect examination, the victim testified that Appellant repeatedly threatened to kill her if she did not submit to the rape.

The doctor conducting the sexual-assault examination noted that the victim had abrasions on her wrists and ankles. She collected a blood sample and other samples that were sealed in an evidence-collection envelope, and the doctor placed her initials on the envelope.

6

Appellant's former wife testified. She confirmed Appellant owned a small handgun. He typically carried the gun on his person in a "fanny pack." He also carried other "tote bags." Appellant wore boat shoes, which the witness testified were perhaps Dockers. He wore a baseball cap, but his hair would stick out from the sides of the cap. Appellant wore aviation sunglasses consistently. Appellant would ride her bicycle which had a child's seat on the back. Appellant and his then wife lived in Mayport, near Atlantic Beach. All of this evidence was consistent with the victim's testimony.

The police officer who first arrived at the victim's home testified that he responded to a sexual assault. When he arrived, he announced his presence. He heard the victim crying for help. Going upstairs the officer found the victim tied up with duct tape "around her eyes." She was nude. Her hands and feet were bound with rope. The officer removed the duct tape and cut the ropes. When asked what the victim's condition was, the officer testified that "her terror was palpable." She could not even cry but was "tearing up" and "she was shaken up." The officer observed a bicycle tire track in the back yard. The victim provided an accurate description of Appellant based on her limited sight and the terror she had experienced.

The victim's neighbor testified she saw a man riding a bicycle who appeared to be "looking for something" near the victim's home, which concerned the neighbor. The neighbor was walking her dog and saw the man repeatedly looking over his shoulder as if looking in people's garages. He was not just out for a "random bicycle ride." The bicycle had an attached child seat. The neighbor testified that she soon saw the same man coming from the victim's back yard. Concerned, she went to the victim's home where the police had arrived.

Detective Vanderwal testified. He had since retired in the twenty-two years between the rape and Appellant's trial, but he remembered the case "through the years" as it stood out "very much." He testified that the victim was "seething" and "really mad about what had happened to her," when he arrived at the crime scene. He collected the sealed sexual-assault envelope and took the

evidence to the Atlantic Beach Police Department refrigerated evidence room.

Detective Vanderwal kept an "open file that stayed on my desk until the day [he] retired" in 1996. Upon his retirement, he placed the file with the next detective. The detective later discovered his file had been destroyed. But the case was so important and memorable to him that he could testify regarding details twenty-two years after Appellant raped the victim.

Detective Vanderwal arrested a suspect soon after the crime and prepared a photospread which he showed the victim. She told him that no one in those pictures matched her rapist. The detective then sent the forensic evidence to the Florida Department of Law Enforcement. He exhausted all investigation into the crime and even exonerated a suspect.

In 2011, fifteen years after his retirement, while reviewing the internet, Detective Vanderwal noticed the arrest of the "East Coast Rapist" who also committed crimes near military bases. Thinking this might be the man who raped the victim, he called the Atlantic Beach Police Department and recommended that it resubmit the forensic evidence to see if the DNA matched. The next day Mr. Vanderwal realized that the rapist here could not be the East Coast Rapist, and he called the Department back, but it had already sent the victim's evidence for reconsideration.

With improved technology, the resubmitted DNA evidence collected from the victim the day of the rape in 1992 and resubmitted for testing in 2011 matched Appellant precisely.

Detective Somerall continued the investigation, which was difficult given the years since the crime. But he located the victim and all other witnesses who testified. He took a cheek swab from the Appellant after Appellant had been identified as a suspect for further DNA testing. Detective Somerall then drove this evidence to the Florida Department of Law Enforcement for further DNA analysis.

Nicole Lee, a DNA analysist with the Florida Department of Law Enforcement crime laboratory and an expert in STR-DNA

analysis, testified that she analyzed Appellant's cheek swabs and the victim's vaginal swabs, found the presence of semen in the victim's rape kit, and concluded that the possibility that someone other than Appellant provided the semen found in the victim's body was 1 in 120 quadrillion Caucasians.

Appellant testified that he has been convicted of one felony. When asked "[i]s it possible during that time you had sex with the victim," he responded, "[a]ccording to the evidence, apparently it seems so." He denied raping or kidnapping the victim. He stated that "[i]t appears [he] must have" had consensual sex with the victim, "apparently" in the back of his van because he had never been to her house, though he "do[es] not recall her" and does not remember having sex with her.

The jury returned verdicts in twenty-four minutes finding Appellant guilty of sexual battery upon a person twelve years of age or older with the use of a deadly weapon, as charged, specifically finding he committed an act of penetration during the commission of the offense, and finding him guilty of kidnapping, as charged, specifically finding he carried, displayed, or used a weapon during the offense.

Because the state's sentencing guidelines in effect in 1992 were so lenient regarding the possible range of punishment for rapes like Appellant's brutal crimes, only allowing a possible sentence of seven-to-seventeen years imprisonment unless the trial court could find aggravating factors justifying an increased sentence, the state sought an upward-departure sentence. The trial court conducted a bifurcated jury proceeding where the State sought to establish six of seven aggravating circumstances.

In that jury-sentencing phase, the victim testified that the perpetrator took her gold necklace and bracelet by force, and that she did not give him permission to enter her dwelling, where he robbed, raped, and kidnapped her. She again testified he threatened to murder her with his gun.

"That night changed [her]," she testified. Although a security system was installed in the home where the crime occurred, she could "not stand living [there] any longer" because "the emotional

trauma of just reliving what [she] went through." She had to move into a new home and take time off from her jobs, she felt like "everyone looked at [her] differently," and she felt dirty, ashamed, embarrassed, and vulnerable. After the crime, she saw the perpetrator's sketch in stores and had "constant flashes of seeing people and wondering, is that him?" The rape "just ate at her," and the trauma "just never went away."

The victim testified that she "never felt safe." Her behaviors changed, and she became very aware of her surroundings almost to the point where she felt paranoid. She attended therapy and has been "very overprotective" of her children. The fact that Appellant raped her in her own home made it *especially scarring*.

Because Appellant knew where she lived, went through her personal effects, and threatened her during the assault, the victim had bad dreams and thoughts about him returning to harm her and she never felt safe. She testified on cross-examination that she suffered pain and trauma from being tied up and taped.

The State asserted that the sexual battery was a crime of violence and was committed in an especially heinous, atrocious, or cruel manner. The trial court instructed the jury on the definitions of "heinous," "atrocious," and "cruel" and that "[t]he kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim."

The State also asserted another aggravating factor: that the sexual battery was committed in a cold, calculated, and premeditated manner, that is, that "[a] crime is premeditated if it occurs after the defendant consciously decides to commit the crime. In order for this aggravating circumstance to apply, a heightened level of premeditation, demonstrated by a substantial period of reflection is required."

Most significantly here, the State proved the aggravating factor that "the victim's emotional trauma was extraordinary and occurred as result of circumstances that are not clearly inherent in the crime charged, such as excessive force or extreme cruelty."

10

In a supplemental verdict the jury found that: Appellant raped the victim while he burglarized the victim's home; he raped the victim in a heinous, atrocious, or cruel manner; he raped the victim in a cold, calculated, and premeditated manner; the victim suffered extraordinary emotional harm as a result of the sexual battery; Appellant possessed a gun while he raped the victim and burglarized her home; and he possessed a gun when he kidnapped the victim by forcing her to walk upstairs to her bedroom where he raped her while looking out her bedroom window to see if her boyfriend was in fact coming back to the home.

After the jury returned its supplemental findings, the trial court stated that:

> I'm going to put on the record some independent findings of the Court, based on the testimony of the victim and the defendant. The Court observed the victim after 22 years from the incident in question still exhibit[] genuine feelings of anger and betrayal, having been violated by this defendant, which demonstrated to the Court the honest and credible emotion still felt by this victim after all these years.
>
> And this is contrasted with the incredible story told by the defendant in his testimony, on the witness stand, under oath, that his sexual intercourse with the victim was consensual, and this was his plausible explanation of the overwhelming DNA evidence linking him to this violent act some 20 years prior.
>
> The evidence put on by the State was very compelling, and as was the evidence of the victim. The testimony of the defendant lacked credibility. The jury apparently felt the same, and came back with a verdict of guilty on both counts filed against the defendant, armed sexual battery, and armed kidnapping.

The trial court proceeded to make detailed oral findings and rulings, which conform to those made in its ensuing order. In its "Order of Deviation from the Guidelines and Imposition of

Sentence," the trial court departed from the sentencing range and imposed consecutive life sentences upon ordering and adjudging as follows:

At the time this Defendant committed the Armed Sexual Battery and Armed Kidnapping for which he was convicted, the 1992 sentencing guidelines were in effect. Both crimes were classified as Life Felonies. The guidelines in this case called for a sentence between 7-17 years. However, based upon the findings of the jury as well as this Court's own independent findings, the Court deems that a sentence exceeding this range is permissible and necessary. This Court arrives at this conclusion based upon the following findings:

. . . .

Based on the time delay between the commission of the crimes and the advent of DNA technology, the statute of limitations prevented the State from charging an Armed Burglary. Nonetheless, during the trial, the jury found unanimously and beyond a reasonable doubt that the Defendant committed the offenses for which he was convicted in the course of an Armed Burglary, an offense that is a first-degree felony punishable by life. Had the State been able to score the Armed Burglary in the guidelines, in addition to the unscored criminal history, the Defendant would have faced a guideline sentence between 22 years and life imprisonment. Accordingly, based on the findings of the jury and this Court's own independent findings from the evidence presented at the trial, this Court assigns this aggravator great weight and in conjunction with the Defendant's unscoreable record, finds it as an independent basis for departing from the guidelines and imposition of a life sentence.

. . . .

During the trial, the Jury found beyond a reasonable doubt that this crime's violence went beyond the violence inherent in a sexual battery and kidnapping and exhibited a level of cruelty that this Court considers in

12

deciding the appropriate sentence. Our Courts have consistently held that the heinous, atrocious, and cruel (HAC) aggravator is one of the weightiest aggravators.. Accordingly, based on the findings of the jury and this Court's own independent findings from the evidence presented at the trial, this Court assigns this aggravator great weight and finds it as an independent basis for departing from the guidelines and imposition of a life sentence.

. . . .

During the trial, the jury found beyond a reasonable doubt that these crimes were perpetrated in a cold, calculated manner, with careful premeditation that went far beyond any "spur of the moment" decision. There was no moral or legal justification for the defendant's actions, and the level of premeditation as evidenced by the defendant's "rape bag" is extremely disturbing. Our Courts have consistently held that the cold, calculated, and premeditated (CCP) aggravator is one of the weightiest aggravators. Accordingly, this Court finds this aggravator as a basis to impose a departure sentence and assign this aggravator great weight. Accordingly, based on the findings of the jury and this Court's own independent findings from the evidence presented at the trial, this Court assigns this aggravator great weight and is an independent basis for departing from the guidelines and imposition of a life sentence.

(citations omitted). The trial court further noted that the jury had found beyond a reasonable doubt the aggravator that the victim suffered extraordinary emotional harm as a result of the crimes:

As the *victim has suffered a lifetime of emotional trauma as a result of the defendant's actions*, so to (*sic*) should this defendant suffer a lifetime of incarceration for his crimes. Accordingly, based on the findings of the jury and this Court's own independent findings from the evidence presented at the trial, this Court assigns this aggravator great weight and is an independent basis for

13

departing from the guidelines and imposition of a life sentence.

(citations omitted) (emphasis added). And the trial court determined that Appellant possessed and used a gun when he kidnapped and raped the victim:

During the trial, the Jury found beyond a reasonable doubt that this aggravator was established. It is important to distinguish between the deadly weapon and weapon requirements that were inherent in the elements of the Armed Sexual Battery and Armed Kidnapping. The law required only a deadly weapon or weapon be used. There is a significant difference between a firearm and an ordinary weapon in terms of the certainty of death or great bodily harm if such a weapon is put to use. Our current "10-20-life" minimum mandatories clearly capture this distinction. If these crimes were committed today, the Defendant would have faced a minimum mandatory 30 years up to life imprisonment. (It would have been 20 years without including the Burglary conviction). Accordingly, based on the findings of the jury and this Court's own independent findings from the evidence presented at the trial, this Court assigns this aggravator great weight and is an independent basis for departing from the guidelines and imposition of a life sentence.

Thus, the jury and the trial court properly performed their duty to consider the horrific facts of Appellant's violent crimes against the victim that inflicted a "lifetime of emotional trauma" on her.

*The United States Supreme Court Should Reconsider Its Decisions Prohibiting the Imposition of the Death Penalty for Rape*

In *Coker v. Georgia,* the United States Supreme Court decided forty-five years ago that the states no longer possessed the legal authority to sentence rapists to death. 433 U.S. 584 (1977). This decision merits further review given the hundreds of thousands of

rape victims tortured and violated since that erroneous decision. Just as importantly, the dissenting justices correctly stated the decision was not based on the text of the United States Constitution but rather on the policy preferences of the majority:

> In a case such as this, confusion often arises as to the Court's proper role in reaching a decision. Our task is not to give effect to our individual views on capital punishment; rather, we must determine what the Constitution permits a State to do under its reserved powers. In striking down the death penalty imposed upon the petitioner in this case, the Court has overstepped the bounds of proper constitutional adjudication *by substituting its policy judgment for that of the state legislature.* I accept that the Eighth Amendment's concept of disproportionality bars the death penalty for minor crimes. But rape is not a minor crime; hence *the Cruel and Unusual Punishments Clause does not give the Members of this Court license to engraft their conceptions of proper public policy onto the considered legislative judgments of the States.* Since I cannot agree that Georgia lacked the constitutional power to impose the penalty of death for rape, I dissent from the Court's judgment.

*Id.* at 604–05 (Burger, C.J., dissenting) (emphasis added).

The facts of *Coker* also bear revisiting and fortify the correct view of the dissenting justices in that case.

> On December 5, 1971, the petitioner, Ehrlich Anthony Coker, raped and then stabbed to death a young woman. Less than eight months later Coker kidnaped and raped a second young woman. After twice raping this 16-year-old victim, he stripped her, severely beat her with a club, and dragged her into a wooded area where he left her for dead. He was apprehended and pleaded guilty to offenses stemming from these incidents. He was sentenced by three separate courts to three life terms, two 20-year terms, and one 8-year term of imprisonment. Each judgment specified that the sentences it imposed were to run consecutively rather than concurrently.

15

Approximately 1 ½ years later, on September 2, 1974, petitioner escaped from the state prison where he was serving these sentences. He promptly raped another 16-year-old woman in the presence of her husband, abducted her from her home, and threatened her with death and serious bodily harm. It is this crime for which the sentence now under review was imposed.

*Id.* at 605 (Burger, C.J., dissenting) (footnotes omitted).

The fact that the former murderer and double-rapist escaped from prison and raped a 16-year-old in the presence of her husband was sufficiently criminally culpable and morally repugnant to merit the death penalty in the view of the sovereign state of Georgia and Coker's jury and judge. But this heinous crime was not sufficiently evil for the plurality majority in *Coker,* which as the dissenting justices asserted, substituted "its policy judgment for that of the state legislature." *Id.* at 604 (Burger, C.J., dissenting). And the majority's "policy judgment" was certainly not based on the history, text, or moral underpinnings of the Eighth Amendment's prohibition against cruel and unusual punishment.

This we know because before the Eighth Amendment was adopted and after its ratification, the sovereign states had the unquestioned power to punish rapists such as Coker with the ultimate criminal penalty. *Id.* at 614–15 (Burger, C.J., dissenting) (stating that more than one-third of states provided for capital punishment for rape from 1900 to the decision in *Furman v. Georgia*, 408 U.S. 238 (1972)).

Even more egregiously, in Coker's case, the majority effectively barred *any additional punishment* for his brutal third rape after escaping prison where he was serving a life sentence for murder and prior rapes:

In fact, given the lengthy sentences Coker must serve for the crimes he has already committed, the Court's holding assures that petitioner as well as others in his position will henceforth feel *no compunction whatsoever about committing further rapes* as frequently as he may be able to escape from confinement and *indeed even within the*

16

*walls of the prison itself.* To what extent we have left States 'elbowroom' to protect innocent persons from depraved human beings like Coker remains in doubt.

. . . .

Unlike the plurality, I would narrow the inquiry in this case to the question actually presented: Does the Eighth Amendment's ban against cruel and unusual punishment prohibit the State of Georgia from executing a person who has, within the space of three years, raped three separate women, killing one and attempting to kill another, who is serving prison terms exceeding his probable lifetime and who has not hesitated to escape confinement at the first available opportunity?

*Id.* at 606–07 (Burger, C.J., dissenting) (emphasis added).

Chief Justice Burger wrote eloquently and persuasively that rape can deserve the imposition of the death penalty, especially given its devastating effect on the victim's entire life (as was seen in the emotional trauma and cruel suffering the jury and trial court found Appellant inflicted on the victim in this case):

The plurality acknowledges the gross nature of the crime of rape. A rapist not only violates a victim's privacy and personal integrity, but inevitably causes serious psychological as well as physical harm in the process. The longrange effect upon the victim's life and health *is likely to be irreparable*; it is impossible to measure the harm which results. Volumes have been written by victims, physicians, and psychiatric specialists on the lasting injury suffered by rape victims. *Rape is not a mere physical attack it is destructive of the human personality.* The remainder of the victim's life may be gravely affected, and this in turn may have a serious detrimental effect upon her husband and any children she may have. I therefore wholly agree with Mr. Justice WHITE's conclusion as far as it goes that '(s)hort of homicide, (rape) is the 'ultimate violation of self.' Victims may recover

17

from the physical damage of knife or bullet wounds, or a beating with fists or a club, but recovery from such a gross assault on the human personality is not healed by medicine or surgery. To speak blandly, as the plurality does, of rape victims who are 'unharmed,' or to classify the human outrage of rape, as does Mr. Justice POWELL, in terms of 'excessively brutal,' versus 'moderately brutal,' takes too little account of the profound suffering the crime imposes upon the victims and their loved ones.

Despite its strong condemnation of rape, the Court reaches the inexplicable conclusion that 'the death penalty . . . is an excessive penalty' for the perpetrator of this heinous offense. This, the Court holds, is true even though in Georgia the death penalty may be imposed only where the rape is coupled with one or more aggravating circumstances. The process by which this conclusion is reached is startling as it is disquieting. It represents a clear departure from precedent by making this Court 'under the aegis of the Cruel and Unusual Punishments Clause, the ultimate arbiter of the standards of criminal responsibility in diverse areas of the criminal law, throughout the country.' This seriously strains and distorts our federal system, removing much of the flexibility from which it has drawn strength for two centuries.

*Id.* at 611–13 (Burger, C.J., dissenting) (citations and footnotes omitted) (emphasis added).

Chief Justice Burger accurately noted that the plurality wrongly viewed very recent history of states' imposition of the death penalty for the rape of an adult in light of that Court's then recent decision in *Furman* invalidating prior capital-punishment statutes.

In any case, when considered in light of the experience since the turn of this century, *where more than one-third of American jurisdictions have consistently provided the death penalty for rape*, the plurality's focus on the experience of the immediate past must be viewed

as truly disingenuous. Having in mind the swift changes in positions of some Members of this Court in the short span of five years, can it rationally be considered a relevant indicator of what our society deems 'cruel and unusual' to look solely to what legislatures have refrained from doing under conditions of great uncertainty arising from our less than lucid holdings on the Eighth Amendment? Far more representative of societal mores of the 20th century is the accepted practice in a substantial number of jurisdictions preceding the Furman decision. '(The) problem . . . is the suddenness of the Court's perception of progress in the human attitude since decisions of only a short while ago.'

However, even were one to give the most charitable acceptance to the plurality's statistical analysis, it still does not, to my mind, support its conclusion. The most that can be claimed is that for the past year Georgia has been the only State whose adult rape death penalty statute has not otherwise been invalidated; two other state legislatures had enacted rape death penalty statutes in the last five years, but these were invalidated for reasons unrelated to rape under the Court's decisions last Term. Even if these figures could be read as indicating that no other States view the death penalty as an appropriate punishment for the rape of an adult woman, it would not necessarily follow that Georgia's imposition of such sanction violates the Eighth Amendment.

The Court has repeatedly pointed to the reserve strength of our federal system which allows state legislatures, within broad limits, to experiment with laws, both criminal and civil, in the effort to achieve socially desirable results.

*Id*. at 614–15 (Burger, C.J., dissenting) (citations omitted) (emphasis added).

But the plurality in *Coker* foreclosed any possibility of the federalism inherent and explicitly provided for in the United

States Constitution by unilaterally exercising raw judicial power to ban any state from imposing capital punishment for this horrific crime which mars victims for a lifetime:

> Three state legislatures have, in the past five years, determined that the taking of human life *and the devastating consequences of rape will be minimized if rapists may, in a limited class of cases, be executed for their offenses*. That these States are presently a minority does not, in my view, make their judgment less worthy of deference. *Our concern for human life must not be confined to the guilty; a state legislature is not to be thought insensitive to human values because it acts firmly to protect the lives and related values of the innocent*. In this area the choices for legislatures are at best painful and difficult and deserve a high degree of deference. Only last Term Mr. Justice White observed:

> > 'It will not do to denigrate these legislative judgments as some form of vestigial savagery or as purely retributive in motivation; for they are solemn judgments, reasonably based, that imposition of the death penalty will save the lives of innocent persons. This concern for life and human values and the sincere efforts of the States to pursue them are matters of the greatest moment with which the judiciary should be most reluctant to interfere.' *Roberts v. Louisiana, supra*, 428 U.S., at 355, 96 S.Ct., at 3017 (dissenting opinion). (Emphasis added.)

> The question of whether the death penalty is an appropriate punishment for rape is surely an open one. It is arguable that many prospective rapists would be deterred by the possibility that they could suffer death for their offense; it is also arguable that the death penalty would have only minimal deterrent effect. It may well be that rape victims would become more willing to report the crime and aid in the apprehension of the criminals if they knew that community disapproval of rapists was sufficiently strong to inflict the extreme penalty; or

perhaps they would be reluctant to cooperate in the prosecution of rapists if they knew that a conviction might result in the imposition of the death penalty. Quite possibly, the occasional, well-publicized execution of egregious rapists may cause citizens to feel greater security in their daily lives; or, on the contrary, it may be that members of a civilized community will suffer the pangs of a heavy conscience because such punishment will be perceived as excessive. We cannot know which among this range of possibilities is correct, but today's holding forecloses the very exploration we have said federalism was intended to foster. *It is difficult to believe that Georgia would long remain alone in punishing rape by death if the next decade demonstrated a drastic reduction in its incidence of rape, an increased cooperation by rape victims in the apprehension and prosecution of rapists, and a greater confidence in the rule of law on the part of the populace.*

In order for Georgia's legislative program to develop it must be given time to take effect so that data may be evaluated for comparison with the experience of States which have not enacted death penalty statutes. Today, the Court repudiates the State's solemn judgment on how best to deal with the crime of rape before anyone can know whether the death penalty is an effective deterrent for one of the most horrible of all crimes.

. . . .

To deprive States of this authority as the Court does, on the basis that '(t)he current judgment with respect to the death penalty for rape . . . weighs very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman,' is impermissibly rash. The current judgment of some Members of this Court has undergone significant change in the short time since *Furman.* Social change on great issues generally reveals itself in small increments, and the 'current judgment' of many States could well be altered on the basis of

21

Georgia's experience, were we to allow its statute to stand.

*Id.* at 616–19 (Burger, C.J., dissenting) (citations and footnotes omitted) (emphasis added).

The dissenting opinion effectively eviscerated the plurality's faulty logic and lack of legal support for their "subjective" opinion that capital punishment for rape was unconstitutional under the Eighth Amendment because the crime did not result in the death of the victim:

> The subjective judgment that the death penalty is simply disproportionate to the crime of rape is even more disturbing than the 'objective' analysis discussed supra. The plurality's conclusion on this point is based upon the bare fact that murder necessarily results in the physical death of the victim, while rape does not. However, no Member of the Court explains why this distinction has relevance, much less constitutional significance. It is, after all, not irrational nor constitutionally impermissible for a legislature to make the penalty more severe than the criminal act it punishes in the hope it would deter wrongdoing:
>
> > 'We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved.' *Gregg v. Georgia*, 428 U.S., at 175, 96 S.Ct., at 2926.
>
> It begs the question to state, as does the plurality opinion:
>
> > Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair.
>
> Until now, the issue under the Eighth Amendment has not been the state of any particular victim after the crime, but rather whether the punishment imposed is grossly disproportionate to the evil committed by the

22

perpetrator. As a matter of constitutional principle, that test cannot have the primitive simplicity of 'life for life, eye for eye, tooth for tooth.' Rather States must be permitted to engage in a more sophisticated weighing of values in dealing with criminal activity which consistently poses serious danger of death or grave bodily harm. If innocent life and limb are to be preserved I see no constitutional barrier in punishing by death all who engage in such activity, regardless of whether the risk comes to fruition in any particular instance.

Only one year ago the Court held it constitutionally permissible to impose the death penalty for the crime of murder, provided that certain procedural safeguards are followed. Today, the plurality readily admits that "(s)hort of homicide, (rape) is the 'ultimate violation of self.'" Moreover, as stated by Mr. Justice Powell:

> 'The threat of serious injury is implicit in the definition of rape; the victim is either forced into submission by physical violence or by the threat of violence.' *Furman v. Georgia*, supra, 408 U.S., at 460, 92 S.Ct., at 2839 (dissenting opinion).

Rape thus is not a crime 'light years' removed from murder in the degree of its heinousness; it certainly poses a serious potential danger to the life and safety of innocent victims apart from the devastating psychic consequences. It would seem to follow therefore that, affording the States proper leeway under the broad standard of the Eighth Amendment, murder is properly punishable by death, rape should be also, if that is the considered judgment of the legislators.

The Court's conclusion to the contrary is very disturbing indeed. The clear implication of today's holding appears to be that the death penalty may be properly imposed only as to crimes resulting in death of the victim. This casts serious doubt upon the constitutional validity of statutes imposing the death penalty for a variety of conduct which, though dangerous, may not necessarily result in any immediate death, e. g.,

treason, airplane hijacking, and kidnaping. In that respect, today's holding does even more harm than is initially apparent. We cannot avoid taking judicial notice that crimes such as airplane hijacking, kidnaping, and mass terrorist activity constitute a serious and increasing danger to the safety of the public. It would be unfortunate indeed if the effect of today's holding were to inhibit States and the Federal Government from experimenting with various remedies including possibly imposition of the penalty of death to prevent and deter such crimes.

*Id.* at 619–21 (Burger, C.J., dissenting) (citations omitted) (emphasis added). This prediction would come to pass 31 years later when the Supreme Court barred the death penalty for the rape of a child in *Kennedy v. Louisiana.*

## *Conclusion*

I concur in affirming the trial court's judgment denying Appellant's Motion for Post-Conviction Relief. The overwhelming evidence proving Appellant's guilt for the armed sexual battery and armed kidnapping of the victim precludes any argument that his counsel's performance, which was not ineffective, could ever be ineffective given that Appellant cannot show prejudice.

The trauma and suffering that Appellant inflicted on the victim, also proven by overwhelming evidence, was horrific. The life sentences imposed on Appellant by the trial court based on the jury's supplemental verdict in this case were just and proper under the law.

If a state determines that crimes such as this merit the ultimate criminal penalty, the United States Supreme Court should overturn *Coker* and allow a state to provide for capital punishment for the rape of an adult victim.

———————————————

Kenneth Bicking III, pro se, Appellant.

Ashley Moody, Attorney General, and Heather Flanagan Ross, Assistant Attorney General, Tallahassee, for Appellee.