# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D2023-0434
_____

JACOB L. HUDSON,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Bay County.
Shonna Young Gay, Judge.


May 1, 2024

PER CURIAM.

AFFIRMED.

ROBERTS and ROWE, JJ., concur; B.L. THOMAS, J., concurs with opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

B.L. Thomas, J., concurring.

I concur in the Court's decision affirming Hudson's judgment and sentence for four counts of capital sexual battery on a child under the age of twelve, and eleven counts of lewd and lascivious molestation and lewd battery on the same victim.

I write to reiterate my view that Hudson and other offenders like him should be subject to the death penalty.

Offenders like Hudson who commit capital sexual battery murder their young victims' innocence. And contrary to the reasoning of the United States Supreme Court in *Kennedy v. Louisiana,* 554 U.S. 407 (2008), and the Florida Supreme Court in *Buford v. State,* 403 So. 2d 943 (Fla. 1981), no decent society should allow such offenders to avoid the just punishment of death for these utterly depraved and horrific capital crimes. Based on recent legislation discussed further below, such offenders may now be sentenced to death in Florida, should these two decisions be overruled.

Sexual crimes of this nature committed against children merit the death penalty in a moral and civilized society.

This was not Hudson's first minor victim of sexual crimes. At sentencing, the State noted he had been sentenced to prison for that offense. In this case, Hudson began victimizing his step-daughter when she was ten years old. He was the only father the victim had ever known. She called Hudson "Dad." The victim testified that before Hudson began sexually assaulting her, she loved Hudson. Her mother described the victim as a "daddy's girl," referring to Hudson, before the crimes occurred.

Hudson forced the victim to perform oral sex on him, forced her to allow him to perform oral sex on her, and committed the other sexual crimes, all while the victim's mother was away from home. The victim was sleeping during one of the assaults, awoke to find her clothes removed, and Hudson committing sexual battery on her. Hudson told the victim he wanted to have sexual intercourse with her, by repeating an obscene slang term. The victim testified she "was only" ten years old and did not know what that meant.

Hudson repeatedly told his victim not to tell anyone or he would go to jail. He gave the victim cosmetics after he committed the sexual crimes against her.

When the victim was eleven years old, she showed her mother some cosmetics Hudson had given her. The victim's mother asked her where she obtained the make-up, and the victim said Hudson gave it to her. Her mother then asked the victim how often Hudson gave her cosmetics, to which the victim stated "every Friday." The victim showed her mother the extensive and unused cosmetics Hudson had given her. After thinking about this unusual arrangement, the victim's mother testified she then thought the excessive gifts seemed like a "bribe."

The mother asked her daughter if Hudson had touched her inappropriately.

At first the victim said "no." But then she started crying and told her mother that "Dad," Hudson, had touched her. The victim then recounted all the sexual crimes Hudson had committed. She told her mother she was afraid to tell because she thought Hudson would hurt her or her mother if she reported his extensive crimes against her. The victim's mother did not go to sleep that night and pretended to be asleep when Hudson returned, because the victim's mother was afraid Hudson would go into the victim's room and commit more sexual assaults.

The victim's mother then informed Hudson's mother and asked her to confront Hudson together, because she was afraid to do so alone. The two of them confronted Hudson.

The victim's mother was screaming, crying, "on the floor," and could not breathe when she confronted Hudson. But Hudson just kept talking about getting dinner. He then calmly told the victim's mother that "If I'm going to spend the rest of my life in prison, I'm going to go outside and smoke a cigarette." Hudson told the victim's mother he was sorry for hurting the victim, and would accept any punishment that might be administered. At first, he told the victim's mother that he would call the police and report the crimes, but he then made her call law enforcement.

The victim participated in two interviews with a Child Protection Team. The State provided notice to Hudson's counsel that the State would introduce both hearsay statements in evidence against Hudson.

The victim testified at trial when she was fifteen years old.

When asked at trial how she felt about the crimes, the victim testified that recounting the events "disgust[ed] her". She tried to "forget" what had occurred.

At sentencing, the victim provided a statement, in which she stated in part:

"I am here today for the ten-year-old me who had no voice. The eleven-year-old me who never thought she would be okay and my world would never be the same. The twelve-year old me who no longer wanted to live. The fourteen-year-old me who thought I would never heal from this pain. Now at fifteen, I stare at this man who brought me all this pain and shame. From this day forward I will not carry this burden. I will not live with this shame, so I give this burden to [Hudson.] You will now carry this pain. You will know the shame you created because I now know it was never mine to have."

### Legislation Now Provides for Imposition of Death Penalty for Certain Child-Sexual Battery Crimes.

At the time Hudson committed these horrific offenses, and told the victim's mother he was ready "to accept" punishment for his crimes, state law did not provide for the death penalty for such crimes. But it does now. *See* §§ 794.011 (2)(a), & 921.1425, Fla. Stat; Ch. 2023-25, Laws of Fla.

In 2023, the legislature authorized this punishment and stated its intent:

> Such crimes destroy the innocence of a young child and violate all standards of decency held by civilized society. The Legislature further finds that *Buford v. State of*

4

*Florida*, 403 So. 2d 943 (Fla. 1981), was wrongly decided, and that *Kennedy v. Louisiana*, 554 U.S. 407, (2008), was wrongly decided and an egregious infringement of the states' power to punish the most heinous of crimes.

§ 921.1425, Fla. Stat.; Ch. 2023-25, Laws of Fla.

In *Lainhart v. State,* I stated in my concurring opinion that crimes such as Hudson committed merit the possibility of the imposition of capital punishment:

> As I have noted previously, *see Bicking v. State*, 348 So. 3d 35, 36 (Fla. 1st DCA 2022), historically the states were permitted to execute such offenders as Appellant, but the United States Supreme Court held in *Kennedy v. Louisiana*, in a 5-4 decision in 2008, that the death penalty was no longer a valid punishment for such horrific crimes as occurred here. 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008). The Court in *Kennedy*, which relied in part on its plurality decision in *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), held that no matter how brutal and dehumanizing a rapist victimizes a person, even a child, the states are not authorized to impose capital punishment for such heinous crimes. I reiterate my view that both of these decisions are wrong as they are not based on the text or the historical underpinnings of the Eighth Amendment. This case is just another sad example of why those decisions are also wrong based on any moral theory of punishment and justice, especially where a perpetrator destroys the innocence of a young child and violates all standards of decency held by any civilized society. *Bicking*, 348 So. 3d at 43.

351 So. 3d 1282, 1283 (Fla. 1st DCA 2022).

In the dissenting opinion in *Kennedy v. Louisiana,* Justice Alito noted:

> The rape of any victim inflicts great injury, and "[s]ome victims are so grievously injured physically or

5

psychologically that life *is* beyond repair." *Coker,* 433 U.S. at 603, 97 S.Ct. 2861 (opinion of Powell, J.). "The immaturity and vulnerability of a child, both physically and psychologically, adds a devastating dimension to rape that is not present when an adult is raped." Meister, Murdering Innocence: The Constitutionality of Capital Child Rape Statutes, 45 Ariz. L.Rev. 197, 208–209 (2003). See also *State v. Wilson,* 96–1392, p. 6 (La. 12/13/96), 685 So.2d 1063, 1067; Broughton, "On Horror's Head Horrors Accumulate": A Reflective Comment on Capital Child Rape Legislation, 39 Duquesne L.Rev. 1, 38 (2000). Long-term studies show that sexual abuse is "grossly intrusive in the lives of children and is harmful to their normal psychological, emotional, and sexual development in ways which no just or humane society can tolerate." C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990).

It has been estimated that as many as 40% of 7– to 13–year–old sexual assault victims are considered "seriously disturbed." A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice, 59 Fed. Probation 69, 70 (Sept. 1995). Psychological problems include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. Meister, *supra,* at 209; Broughton, *supra,* at 38; Glazer, Child Rapists Beware! The Death Penalty and Louisiana's Amended Aggravated Rape Statute, 25 Am. J.Crim. L. 79, 88 (1997).

The deep problems that afflict child-rape victims often become society's problems as well. Commentators have noted correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness. Broughton, *supra,* at 38; Glazer, *supra,* at 89; Handbook on Sexual Abuse of Children 7 (L. Walker ed.1988).

Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes and nearly 30 times more likely to be arrested for prostitution. *Ibid.*

The harm that is caused to the victims and to society at large by the worst child rapists is grave. It is the judgment of the Louisiana lawmakers and those in an increasing number of other States that these harms justify the death penalty. The Court provides no cogent explanation why this legislative judgment should be overridden. Conclusory references to "decency," "moderation," "restraint," "full progress," and "moral judgment" are not enough.

554 U.S. at 468–69.

Hudson murdered the innocence of the victim. In the future, should the decisions in *Kennedy* and *Buford* be overruled, perpetrators who commit such crimes may and should be subject to the imposition of the death penalty as provided in law.

————————————————

Jessica J. Yeary, Public Defender, and Ross Haine, Assistant Public Defender, Tallahassee.

Ashley Moody, Attorney General, and Robert Charles "Charlie" Lee, Assistant Attorney General, Tallahassee, for Appellee.